**Robert E. HUNTER, M.D., Appellant,**

v.

**Sid HARTMAN and CBS, Inc., Respondents.**

No. C2–95–2143.

Court of Appeals of Minnesota.

April 16, 1996.

Thomas L. Johnson, Laura J. Hein, and Carl Crosby Lehmann, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for appellant.

John P. Borger, Eric E. Jorstad, Faegre & Benson, Minneapolis, and Susanna Lowy and Anthony Bongiorno, New York City, for respondents.

Considered and decided by CRIPPEN, P.J., and AMUNDSON and MULALLY,* JJ.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

CRIPPEN, Judge.

In this defamation suit, appellant Robert Hunter, M.D., an orthopedic surgeon and former orthopedic consultant to the University of Minnesota football program, sued respondent Sid Hartman, a well-known sports writer and radio commentator in Minnesota, for statements respondent made about appellant on respondent's weekly radio sports talk show. The trial court granted summary judgment for respondent, who claimed that appellant was a limited purpose public figure who must prove actual malice to succeed as a plaintiff in a defamation action, and that appellant's evidence was insufficient as a matter of law to show that respondent made the allegedly defamatory statements with actual malice. We affirm.

## FACTS

1. Public Figure, Public Controversy

The trial court first determined that appellant was a limited purpose public figure, finding that appellant had taken a purposeful or prominent role in a public controversy. Specifically, the court found that appellant had entered a national debate surrounding the conduct and integrity of Notre Dame football coach Lou Holtz. In support of this determination, the court considered extensive background information.

After losing 1982 and 1983 football seasons under coach Joe Salem's direction, the University of Minnesota replaced Salem with Lou Holtz, since named head football coach at the University of Notre Dame. Following his first season with Minnesota, Holtz requested that appellant, orthopedic consultant to the team, be removed from his position. Appellant was replaced as football consultant but continued as consultant for all other men's teams at Minnesota until 1989, when he took a position in Colorado.

In the fall of 1993, a book was published about Lou Holtz's coaching methods and their effect on the integrity of the University of Notre Dame. Entitled *Under the Tarnished Dome: How Notre Dame Betrayed its Ideals for Football Glory*, the book stirred up a national controversy about Holtz and Notre Dame.

The authors of *Under the Tarnished Dome* interviewed appellant and included appellant's statements about Holtz in a chapter examining Holtz's treatment of injured players. Statements in the book attributed to appellant are harshly critical of Holtz. Examples include:

"I thought Holtz was sick. He needed medication, something."

"Lou is a repellant. Nobody can stay around him for long."

"Holtz stomped away like a spoiled child."

"What [Holtz] does is sacrifice a young man's well-being on the altar of football success."

In sum, *Under the Tarnished Dome* cited appellant as authority for charges that Holtz is callous about the treatment and well-being of athletes, particularly by having them play when injured. The book also contained a photo of appellant.

*Under the Tarnished Dome* generated enough public interest that the television series *Nightline* dedicated a broadcast to the book's allegations. Appellant appeared on the broadcast as one of the book's sources. Appellant's brief comments on the broadcast resembled those attributed to him in the book.

Based on the above, the trial court found that appellant had thrust himself into an existing public controversy surrounding Lou Holtz and his football coaching methods.

2. Relatedness

Observing that public figure analysis requires a relation between the public controversy and the allegedly defamatory statements, the court considered the following facts in determining whether respondent's comments about appellant were germane to the public debate over Lou Holtz's coaching.

After *Under the Tarnished Dome* was published, respondent criticized the book in his regular Star Tribune newspaper column. Respondent particularly discredited appellant's contributions to the book, implying that appellant was motivated by ill will toward

Holtz: "The true story is that [appellant] is upset because Holtz replaced him with Dr. Pat Smith as the orthopedic doctor for the Gophers football team."

Respondent made additional comments about appellant in relation to Holtz during an October 1993 broadcast of respondent's weekly "Sports Huddle" radio show. The format of "Sports Huddle" is informal; respondent and a co-host discuss various sports topics between themselves, interview coaches and players, and take phone calls from the listening audience.

A major topic of the relevant broadcast was a Minnesota–Purdue football game played the day before the radio show. At some point during discussion of the game, respondent stated:

I gotta give Timmy Salem [Joe Salem's son and assistant Purdue coach] a lot of credit cause he's the offensive genius on that Purdue staff. And, uh, we were talking last night about the great Doctor Hunter, yesterday noon, talking about the great Doctor Hunter who ripped Lou Holtz for firing him. We were talking at lunch at the Marriott Hotel and Joe said in 1982 Mr. Hunter operated on 12 players. Hardly any of them came back to play at all. Some of them never played. Some of them played at, uh, about half their ability. So there was a good reason, Mr. Hunter, why Mr. Holtz discharged ya.

Appellant's name resurfaced three times in the course of the October broadcast as callers attempted to follow up on respondent's initial comment. During those calls, respondent made allegedly defamatory statements about appellant. Based on the above history, the trial court found that respondent's comments about appellant were related to the controversy over Holtz because they were intended to identify and belittle appellant's motive for publicly criticizing Holtz.

## 3. Trial Court Analysis of Actual Malice

■ Having concluded that appellant was a limited purpose public figure, the trial court considered whether appellant had presented adequate evidence of actual malice to survive respondent's summary judgment motion. To show actual malice, a defamation plaintiff must demonstrate by clear and convincing evidence that the defendant made defamatory statements either knowing the statements were false or acting recklessly with regard to whether the statements were true. *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). In deciding this issue, the trial court considered the following evidence.

The day before the October "Sports Huddle" broadcast and respondent's allegedly defamatory statements, respondent and Joe Salem met for lunch. During that lunch, the topic of Salem's losing the 1982 and 1983 football seasons came up. Salem cited an unusually high injury rate in 1982 as a factor in the team's decline and recalls mentioning to respondent that the team "had 12 knee injuries" that year.

As discussed above, respondent related his conversation with Salem to listeners of his "Sports Huddle" broadcast the next day. Respondent cited Salem as the source of information that appellant had performed knee surgery on 12 players in 1982 and added, "[h]ardly any of [the injured players operated on by appellant] came back to play at all. Some of them never played. Some of them played at, uh, about half their ability." When three callers subsequently challenged respondent's information, respondent's replies became less equivocal than his initial statement. The three statements that appellant alleges defamed him include respondent's once repeated observation that "none of" the 12 players operated on by appellant "came back to play," and respondent's like statement that "none of" the 12 players "could play" after their operations.[1]

In considering whether respondent made these three statements with knowledge that

1. In full, the statements were:
   "All I know is his record is, they had 12 knee operations in '82—nobody ever came back to play."
   "I said that Joe Salem said that they had 12 knee operations the last year he was there.

The fact that those guys couldn't play cost Joe Salem his job, O.K.?"
   "Joe Salem told me at lunch yesterday that 12 guys he operated on, none of them came back to play, so that's good enough."

they were false or recklessness as to whether they were true, the trial court acknowledged evidence in the record (a) that respondent knew at the time of his statements that some of the 12 players did in fact play football for the University of Minnesota following surgery, (b) that there was reason to doubt respondent's claim that when he said players "never came back to play," he meant that they never "played well" again, not that they never played football for Minnesota again, (c) that Joe Salem never made statements to respondent about the return-to-play status of injured Gopher players in 1982, despite respondent's characterizations of Salem's remarks as the source of his information, (d) that respondent's statements were so highly improbable as to be reckless, and (e) that respondent bore some ill will toward appellant. The court found appellant's evidence sufficient to raise a genuine fact dispute with respect to the question of whether respondent acted with actual malice. Nonetheless, it held the evidence insufficient as a matter of law to support a jury finding of actual malice by the exacting "clear and convincing evidence" standard governing actual malice determinations, pointing to evidence of (a) Salem's equivocation in denying that he discussed players' return-to-play status with respondent, (b) the qualified nature of respondent's first statement about players' return-to-play status in 1982, and (c) the spontaneous, fast-paced format of respondent's radio broadcast.

## ISSUES

1. Whether the trial court determined correctly that respondent's allegedly defamatory statements were "related to" the public Holtz controversy because those statements concerned appellant's motivation for publicly criticizing Holtz.

2. Whether the trial court erred in holding that appellant's defamation claim failed as a matter of law, a holding the trial court premised on the actual malice standard.

## ANALYSIS

### I.

On appeal from summary judgment, we must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law, viewing the evidence in the light most favorable to the nonmoving party. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993); *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Whether an individual is a public figure for the purpose of applying defamation law is a question of law for the court to decide, and we must view the trial court's public figure determination de novo. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); *Jadwin v. Minneapolis Star & Tribune,* 367 N.W.2d 476, 483 (Minn. 1985).

The United States Supreme Court has defined several types of "public figures" who may only succeed in defamation cases by showing that they were defamed by statements made with "actual malice." *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974); *Jadwin,* 367 N.W.2d at 480. One type of public figure is the "limited purpose" public figure or person who has "thrust [himself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009.

The test for determining whether an individual is a limited purpose public figure in the context of a defamation suit has three elements: (a) the existence of a public controversy, (b) the individual's purposeful or prominent role in that controversy, and (c) a relation between the allegedly defamatory statements and the public controversy. *Waldbaum v. Fairchild Publications,* 627 F.2d 1287, 1296–98 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The trial court found all three elements to be present in this case; appellant has appealed only the trial court's determination that respondent's statements were related to the established controversy about Lou Holtz and Notre Dame.

Explaining the relatedness element of the "limited purpose" test, the Federal

Circuit Court for the District of Columbia stated that a plaintiff's "talents, education, experience, and motives" might be relevant to his participation in a controversy. *Waldbaum,* 627 F.2d at 1298. Respondent's statements about appellant's professional record are germane to the Lou Holtz–Notre Dame controversy because they propose a motive for appellant having entered the public controversy over Lou Holtz. As the trial court found, "the comments are germane because they are an attempt to impugn Hunter's credibility and integrity in order to affect the public's perception of Hunter's public comments about Holtz." Respondent's statement "there was a good reason, Mr. Hunter, why Lou Holtz fired ya" reflects respondent's intent to communicate the reason why, in respondent's view, appellant spoke out against Holtz. Respondent claimed that appellant's criticism of Holtz was attributable to his termination as orthopedic consultant and that appellant had no cause to grieve the loss of his position. And it requires little imagination to construe respondent's remarks as an attempt to cast appellant, rather than Holtz, as the villain in the uproar surrounding Holtz's treatment of injured football players; the problem, respondent suggested, was not a coach who was too eager to play students but a doctor whose treatment or standards kept them from playing. We affirm the trial court's finding that respondent's comments were related to the public controversy over Holtz and his coaching.

## II.

■■■■ The trial court ultimately granted respondent's summary judgment motion because it determined that appellant failed to produce sufficient evidence of actual malice. A public figure defamation plaintiff must show that a defendant's statements were defamatory[2] and demonstrate, by clear and convincing evidence, that the defendant made the statements with actual malice, that is, either knowing that they were false or with reckless disregard for whether they were true. *Anderson v. Liberty Lobby,* 477 U.S.

242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986); *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *Britton v. Koep,* 470 N.W.2d 518, 524 (Minn.1991).

Appellant contends that the trial court erred by "weighing evidence" while considering whether appellant's claim should survive summary judgment with respect to the issue of actual malice. Respondent submits not only that appellant failed to provide clear and convincing evidence of actual malice, but also that his comments are not actionable as a matter of law because the comments were substantially true when viewed in their context. *Moldea v. New York Times Co.,* 22 F.3d 310, 317 (D.C.Cir.) (only if "no reasonable person could find" the allegedly defamatory statements "supportable interpretations" of the situation being described are the statements actionable in defamation) (emphasis omitted), *cert. denied,* — U.S. ——, 115 S.Ct. 202, 130 L.Ed.2d 133 (1994). Respondent ties this contention in part to the proposition that courts take a grudging view of proof of falsity in the setting of comments on public figures. *See Liberty Lobby v. Dow Jones & Co.,* 838 F.2d 1287, 1292 (D.C.Cir.) ("Where the question of truth or falsity is a close one, a court should err on the side of nonactionability."), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).

The trial court, although chiefly engaged in considering the sufficiency of appellant's evidence of malice, also observed that the context of a sports radio show was an important consideration, emphasizing the spontaneity of exchanges in that format. Respondent further stresses the relevance of context, describing live sports talk shows as "full of heartfelt but opposing opinions and the dynamic rhetoric of sports commentary." Other authorities have characterized the contextual surroundings of sports commentary less politely. *See, e.g., Moldea,* 22 F.3d at 313 ("Sports columnists frequently offer intemperate denunciations of coaches' play-calling or strategy, and readers know this and pre-

---

**2.** Respondent's statements, if viewed as false statements attacking appellant's professional competence, were defamatory per se. *See, e.g., Anderson v. Kammeier,* 262 N.W.2d 366, 372 (Minn.1977) ("imputations affecting a person's conduct of business, trade, or profession" may constitute defamation per se).

sumably take such railings with a grain of salt * * *.").

We find it unnecessary to reach the question of malice. Having examined respondent's contentions and the trial court's regard for the context of respondent's remarks, we apply three pertinent doctrines of law whereby comments in the context of sports talk banter may be nonactionable as a matter of law for lack of a provably false statement of fact. Confined at least to the case of comments on a public figure, respondent's remarks fall within a genre of imaginative or critical commentary afforded particular protection under the First Amendment. After stating the doctrines of hyperbole, opinion and substantial truth, we will discuss application of this law to the facts of the case.

### 1. Hyperbole

■ The United States Supreme Court has repeatedly held that the First Amendment protects mere rhetorical hyperbole or statements that could not reasonably be interpreted as stating actual facts. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16–17, 110 S.Ct. 2695, 2704–05, 111 L.Ed.2d 1 (1990) (listing cases). The context of a remark, if one that would lead even the most careless listener to perceive the remark as exaggerated or imaginative commentary, may make an otherwise defamatory comment protected hyperbole. *Id.* at 16–17, 21, 110 S.Ct. at 2704–05, 2707 (comment unprotected because no "loose, figurative, or hyperbolic language" was present to "negate the impression" that the writer was seriously making a defamatory accusation, and because the "general tenor of the article" failed to negate this impression); *see also Moldea*, 22 F.3d at 314 ("[I]t is in part the settings of the speech in question that makes their hyperbolic nature apparent.") (emphasis omitted); *Phantom Touring v. Affiliated Publications*, 953 F.2d 724, 729 (1st Cir.) (statements made in context of opinionated theater column "not reasonably interpreted as stating 'actual facts' "), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992).

It is significant for purposes of this case that the hyperbole doctrine has been applied to protect remarks made in the context of sports talk. *See Washington v. Smith*, 893 F.Supp. 60, 63 n. 6 (D.D.C.1995) (court expressed "serious doubts that [comments made in context of a sports preview magazine could] reasonably be interpreted as anything but hyperbole"); *Brooks v. Paige*, 773 P.2d 1098, 1101 (Colo.Ct.App.1988) (comments made in context of "live television broadcast of a local sports talk show * * * directed to a sports-minded audience" were "not deliberate or reckless falsehoods, but merely rhetorical hyperbole"), *cert. denied*, (Colo. May 30, 1989); *cf. Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707 (discounting fact that allegedly defamatory statements appeared in context of sports page where "clear impact in some nine sentences and a caption" was that the plaintiff had committed perjury) (quoting *Scott v. News–Herald*, 25 Ohio St.3d 243, 496 N.E.2d 699, 707 (1986)).

### 2. Opinion

■ In *Milkovich v. Lorain Journal Co.*, the United State Supreme Court rejected a developing body of federal circuit court case law that had created a wholesale exemption from defamation liability for statements of opinion. *Milkovich* held that even statements couched as opinions may be unprotected if they imply a defamatory factual assertion. *Milkovich*, 497 U.S. at 18–20, 110 S.Ct. at 2705–06. But the Court reserved protection for expressions of opinion not "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21, 110 S.Ct. at 2707.

■ Again, for purposes of opinion law, context is relevant to the process of distinguishing nonactionable statements of opinion from actionable statements. *See, e.g., Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995) ("The Supreme Court and other courts have emphasized that one must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact."); *Phantom Touring*, 953 F.2d at 729 ("The sum effect of the format, tone and entire content of the articles is to make it unmistakably clear that [the author] was expressing a point of view only."); *Hunt v. University of Minnesota*, 465 N.W.2d 88, 94 (Minn.App.1991) (in determining whether opinion is protected, the court must examine

"the political, literary, and social context in which the statement was made").

### 3. Substantial Truth

█ Finally, a more recent doctrine extends First Amendment protection to statements that are "substantially true"—that is, "supportable interpretations" of ambiguous underlying situations. *Moldea*, 22 F.3d at 316–19 (court "constrained" to find allegedly defamatory statements made in a book review "substantially true" and therefore not actionable because a reasonable person could find the statements to be "supportable interpretations"); *Washington*, 893 F.Supp. at 64 (applying "supportable interpretation" standard); *see also Liberty Lobby*, 838 F.2d at 1296 (a statement is nonactionable if "[t]he sting of the charge * * * is substantially true").

█ A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of "falsity" is possible in such circumstances. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 512–13, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (allegedly defamatory criticism of speaker system in consumer magazine not actionable because criticism was " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer") (quoting *Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971)); *Washington*, 893 F.Supp. at 64 (allegedly defamatory assessment in sports preview magazine of plaintiff's coaching ability inactionable because "[r]easonable minds can interpret the statistics [interpreted by commentator] differently").

█ As articulated by the United States Court of Appeals for the District of Columbia, the "substantial truth" test is broad: if any "reasonable person" could find the statements to be "supportable interpretations" of their subjects, the statements are incapable of carrying a defamatory meaning, even if "a

reasonable jury" could find that the statements were mischaracterizations. *Moldea*, 22 F.3d at 317; *Washington*, 893 F.Supp. at 62.

█ Here again, courts consider context—including the context of sports talk—when determining whether a statement is a supportable interpretation of the event the speaker is describing. *Moldea*, 22 F.3d at 315 (in context of literary or artistic criticism, critic must be afforded "latitude" to assess work; if review is a supportable interpretation of its subject, it is not actionable); *Washington*, 893 F.Supp. at 64 (court's determination of whether unfavorable comment had a supportable interpretation was influenced by fact that comment appeared in sports magazine: "[a] sports preview magazine deals with such inherently ambiguous material that the Court must allow wide latitude for interpretation").

### 4. Application of the Context–Centered Doctrines

█ We agree with respondent, for purposes at least of this suit by a public figure, that appellant's defamation claim fails chiefly because his evidence does not contradict the view that respondent's statements, in their context, were substantially true. Secondarily, we find that the facts of this case trigger protection under the hyperbole and opinion doctrines.

As all of the context-centered doctrines dictate, we must consider the circumstances surrounding respondent's statements that "none" of the injured players operated on by appellant "came back to play." Given the ambiguity of the challenged statements (about the activity of players rather than the quality of medical care, with uncertainty about the quantity or quality of subsequent athletic performance, and with uncertainty about the number who played again), the incautious exchange of opinions on a sports talk show, and overriding controversy about the proper level of caution in permitting activity of players after surgery, critical problems plague attempts to read the implication of a factual statement into respondent's comments. There follows a more thorough re-

view of the contextual considerations that dictate our decision in this case. Based on this review, we find it wholly unclear what objective assertion of fact might have been implied from respondent's comments and difficult to construe those comments as other than one of many supportable interpretations of the underlying events. In short, this is not the case where "no reasonable person could find" that the remarks of respondent were a supportable interpretation of the situation being described. *Moldea*, 22 F.3d at 317. A "reasonable person" could construe respondent's remarks within their context as representing several supportable meanings other than the objective assertion of fact that appellant demonstrated professional incompetence during his tenure as orthopedic consultant to the University of Minnesota football team.

We detect at least five layers of context that "negate [the] impression" that respondent seriously directed a charge of incompetence against appellant. *Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707; *see also Partington*, 56 F.3d at 1153 (considering multiple levels of context in evaluating actionability of allegedly defamatory statements). First, the words of the statements themselves are ambiguous. Respondent stated that none of appellant's knee injury patients in 1982 "returned to play." He did not state that appellant's operations were uniformly unsuccessful, or that appellant was an inept surgeon; those conclusions are inferences that must be read into respondent's statements. Another inference is that appellant simply insisted that athletes take longer to recover from injury than respondent believed necessary.

Second, widening the analysis to other statements by respondent during the broadcast renders respondent's remarks more ambiguous. Respondent's first comment regarding the injured players' return to play status was limited: "Hardly any of them came back to play at all. Some of them never played. Some of them played at, uh, about half their ability." As the trial court observed, these initial equivocal statements tend to "negate the impression" that respondent's later statements were serious charges that respondent's 1982 knee surgeries were

entirely unsuccessful. Additionally, when a caller admonished respondent that his comments made appellant appear incompetent, respondent stated, "I did not say he was incompetent," further revealing that respondent's statements, while critical, were not aimed at the subject of appellant's competence as surgeon. Finally, the hyperbolic tone of respondent's entire line of commentary about appellant is highlighted in respondent's statement to a caller, "All I know is every operation [appellant's successor] has made on these players, they're all playing. * * * I'll give you twenty guys that are playing that had Rob Hunter been around, they wouldn't be playing." Viewed together, the collection of comments regarding appellant made by respondent during the pertinent sports broadcast do not require the conclusion, advanced by appellant, that respondent was "seriously maintaining" that appellant was an incompetent surgeon.

Third, further enlarging the ambiguity of respondent's statements, respondent's testimony regarding his use of the term "play" within sports analysis supports the conclusion that the phrase "nobody came back to play" is open to different interpretations. Respondent stated that he often comments that a certain athlete "didn't play" meaning not that the athlete was absent from the game, but that the intensity or quality of the athlete's performance was weak. This testimony suggests yet another interpretation of respondent's statements other than a charge of medical incompetence directed at appellant: the injured athletes played football again, but not with their usual level of skill.

Fourth, the larger context of the public debate over Lou Holtz offers support for a conclusion that respondent's remarks were an attack on appellant's prudence rather than his professional skill. The gist of appellant's public criticism of Holtz was that Holtz unreasonably required injured athletes to play before they were ready. Having held that the Holtz debate in part motivated respondent's remarks, we find it a strong possibility that those remarks were meant and understood simply as a statement of respondent's opinion that appellant unduly held injured athletes out of competition—precisely

the opposite charge of that leveled against Holtz by appellant.

Finally, the context of the live sports talk program itself overarches all other contextual factors. As several courts have observed, sports commentary is marked not only by spontaneity, but by the often exaggerated and uncareful exchange of vehemently held opinions; listeners understand the atmosphere of overstatement and "take such railings with a grain of salt." *Moldea*, 22 F.3d at 313; *see also Partington*, 56 F.3d at 1154 ("docudrama" style book is context readers would recognize to contain "highly subjective opinions of the author rather than assertions of verifiable, objective facts"); *Moldea*, 22 F.3d at 315 (book review expected by readers to contain opinionated language, literary critics are afforded "latitude" to comment on works); *Phantom Touring*, 953 F.2d at 729 (theater column "a type of article generally known to contain more opinionated writing than the typical news report"). Moreover, there is precedent for considering the general reputation of a genre of commentators, such as sports pundits, if that reputation is one that would lead a listener to expect personal perspective and overstatement to permeate the commentator's remarks. *See Partington*, 56 F.3d at 1153–54 (readers expect popular books written by trial lawyers, who are "not known for their modesty," to contain healthy doses of opinion and bravado).

All of these layers of context demonstrate that respondent's listeners could and likely did draw a range of conclusions about the meaning of respondent's remarks, including the conclusion that appellant was overcautious about returning injured athletes to play, the conclusion that the athletes played after surgery but not as well, or that some may have fully recovered, and the conclusion that respondent was exaggerating the poor results of appellant's 1982 surgeries.

Analyzed somewhat differently, respondent's remarks were clearly a personal interpretation of a large collection of information; respondent knew that (a) appellant performed most surgeries for the Minnesota football team in 1982, (b) there were an unusual number of knee injuries that year,

(c) the team worsened because of the injuries, (d) appellant was discharged after the 1983 season, and (e) appellant has since publicly criticized Minnesota couch Lou Holtz for disagreeing with his philosophy on returning injured athletes to play. This information is open to various reasonable interpretations, and that mere fact is fatal to appellant's case because it allows room for a "reasonable" person to find appellant's comments to be a "supportable interpretation" of the underlying facts. *Moldea*, 22 F.3d at 315–19; *Washington*, 893 F.Supp. at 64.

The multilayered context of respondent's statements reveals them to be, if not mere hyperbole, at least supportable interpretations that do not assert an objective fact. Such statements are not sufficiently false as a matter of law to support a defamation claim.

Because of our conclusions on the matter of falsity, we do not reach the issue of actual malice. Indeed, a brief review of the trial court's effort to decide that issue reinforces the nonactionability of this case as a matter of law. Appellant argues that the record contains clear evidence that respondent knew at the time of the radio broadcast that some of the injured players came back to play football for Minnesota. But we cannot interpret this evidence as proof that respondent knew the falsity of his statements without narrowly assuming the meaning of those statements to be what appellant alleges— charges that none of appellant's 1982 patients played football again. Similarly, the evidentiary factors of Joe Salem as a source for respondents statements and the "high improbability" of appellant performing 12 consecutive unsuccessful knee operations are pertinent only if we assume respondent's comments to assert appellant's incompetence by route of alleging a long string of uniformly unsuccessful surgeries.

We cannot make such an assumption. The case law on falsity of declarations prohibits us from ignoring the context surrounding respondent's statement, and within that context, respondent's comments are open to various reasonable interpretations other than the assertion that appellant was an incompetent surgeon. Once we have acknowledged

these various interpretations, finding that the statements were in their context "substantially true" interpretations of the events respondent was purporting to comment upon, there is no remaining basis to ask whether the statements were made with knowledge that they were false.

## DECISION

The trial court properly found appellant to be a limited purpose public figure; respondent's comments, intended to illumine appellant's motives for joining an established public controversy, were related to that controversy. Further, the trial court's determination that appellant's defamation claim fails as a matter of law was correct.

The comments appellant contends defamed him, viewed within their specific and general contexts including the context of a live sports talk show, were open to various interpretations. Because a reasonable person could find at least some of the interpretations to be supportable evaluations of the situation described, respondent's statements were not sufficiently false to support a defamation claim.

**Affirmed.**