# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-3043

_____

| | |
|---|---|
| Fox Sports Net North, LLC, a Delaware limited liability company, | * * * |
| Appellant, | * * |
| v. | * * |
| Minnesota Twins Partnership, a Minnesota general partnership; Kevin Cattoor, its Chief Operating Officer, | * * * * |
| Appellees. | * |

Appeals from the United States
District Court for the
District of Minnesota.

_____

No. 02-3098

_____

| | |
|---|---|
| Fox Sports Net North, LLC, a Delaware limited liability company, | * * * |
| Appellee, | * * |
| v. | * * |
| Minnesota Twins Partnership, a Minnesota general partnership; Kevin Cattoor, its Chief Operating Officer, | * * * * |
| Appellants, | * |

_____

Submitted: December 9, 2002

Filed: February 10, 2003
_____

Before WOLLMAN, HEANEY, and MELLOY,  Circuit Judges.
_____

HEANEY, Circuit Judge.

In this diversity case, Fox Sports Net North, LLC ("Fox") brought suit against Minnesota Twins Partnership ("the Twins") and Kevin Cattoor, the Twins's chief operating officer.  Fox's claims against the Twins alleged breach of contract,[1] breach of duty of good faith and fair dealing, misappropriation of trade secrets, and tortious interference with contract.  Fox sued Cattoor individually for misappropriation of trade secrets, breach of common law and fiduciary duties, tortious interference with contract, and tortious interference with business relations.  The Twins and Cattoor counterclaimed, alleging business defamation, defamation, unfair competition, and tortious interference with prospective business relations.  The district court[2] granted summary judgment on all claims.  Both parties appeal, and we affirm.

## BACKGROUND

This case centers around telecast rights for sporting events.  In January of 1998, the Twins and Midwest Sports Channel ("MSC") entered into a Telecast Agreement

---

[1]Fox simultaneously sought a declaratory judgment that the same contract was valid and enforceable.

[2]The Honorable David S. Doty, United States District Court for the District of Minnesota.

granting MSC the right to televise a number of Minnesota Twins baseball games on its network. At that time, Kevin Cattoor was general manager and vice-president of MSC.

Under the Telecast Agreement, MSC obtained the right to televise Twins games from 1998 through the 2001 season. The agreement also contained an option clause, by which MSC could extend the contract for two additional seasons if, by the end of the 2001 season, the Twins were able to "secure an acceptable stadium solution, excluding a new stadium." (Appellant's Confidential App. at 277.)[3] Thus, if there were an acceptable stadium solution before the end of their 2001 season, MSC could televise Twins games for the 2002 and 2003 seasons.

The Telecast Agreement also contained a clause that entitled the Twins to yearly bonus payments if certain conditions were met. The bonus would be triggered if, "[d]uring the Term of this Agreement . . . the Twins secure an acceptable stadium solution or new stadium solution which secures the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years." (Id. at 278.) If the Twins met these conditions, the bonus payments would be due for every season "following the acceptable solution." (Id.)

In 1998, the Twins entered into a lease agreement with the Metropolitan Sports Facilities Commission that obligated the Twins to continue playing home games at the Hubert H. Humphrey Metrodome ("Metrodome") in Minneapolis, Minnesota through the 2000 season. The lease agreement contained three separate, one-year option clauses, which the Twins could exercise to use the Metrodome for the 2001, 2002, and 2003 seasons. After effectuating the lease agreement, the Twins notified

---

[3]Although we cite certain appendices as "confidential," this is simply a reference to the volume title as designated by the parties and is not intended to confer any protected status on the documents contained therein.

MSC that it had an acceptable stadium solution because, including the lease option years, the Twins had the ability to stay in the Twin Cities metro area through the 2003 season. Accordingly, the Twins argued that it had met the conditions that entitled the Twins to bonus payments. MSC disagreed, reasoning that the lease did not secure the Twins in the metro area through the 2003 season because the lease options for years 2001, 2002, and 2003 were not yet exercised. No litigation arose as a result of this dispute, and it remained unresolved.

In March of 2000, Kevin Cattoor left MSC to work for a different company, but by fall of 2000, Cattoor had joined the Twins as chief operating officer. As part of his job, he was responsible for exploring the viability of Victory Sports, a regional sports network wholly owned by the Twins's parent corporation. Cattoor began to investigate the possibility of having Victory Sports televise games of the Twins, the Minnesota Timberwolves, the Milwaukee Bucks, and the Minnesota Gophers, all of which had telecast agreements with MSC.

On September 27, 2000, the Twins exercised its option to play home games in the Metrodome for the 2001 season. In February of 2001, Fox bought MSC. Shortly after Fox took over MSC's operations, it sent the Twins a letter asserting its belief that there was an acceptable stadium solution, and informing the Twins that Fox would exercise its right to broadcast games for the 2002 and 2003 seasons. Fox maintained, however, that the Twins had *not* secured an acceptable stadium solution sufficient to qualify the Twins for bonus payments under the contract. The Twins disputed Fox's interpretation of the Telecast Agreement. Fox responded by filing suit against the Twins and Cattoor on May 30, 2001.

In October of 2001, the Twins exercised their 2002 option to play home games in the Metrodome. Because the contract dispute in this suit was not finally resolved by the time the 2002 baseball season began, the Twins agreed to have Fox carry its games for that season in accordance with the Telecast Agreement.

On May 8, 2002, the district court granted summary judgment in favor of Fox on the contract claim, finding that as a result of the Twins's Metrodome lease agreement with its unexercised option years, the Twins had secured an acceptable stadium solution sufficient to trigger Fox's right to televise the Twins's 2002 and 2003 games. Nonetheless, the court held that because the Twins were not, at the time of the order, committed to staying in the Twin Cities metro area through the 2003 season, the Twins were not entitled to bonus payments.

On June 6, 2002, the Twins exercised their option to play home games at the Metrodome for the 2003 season. The Twins argued to the district court that they had now satisfied all conditions that would entitle it to bonus payments, as they had secured an acceptable stadium solution through the term of the Telecast Agreement, including the option years. The district court agreed, and ordered Fox to pay the Twins bonus payments for the 2001, 2002, and 2003 seasons. By separate order, the court denied relief on all parties' tort claims. This appeal followed.

## DISCUSSION

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The district court's interpretation of a contract's terms and effect are reviewed de novo, John Morrell & Co. v. Local Union 304A, 913 F.2d 544 (8th Cir. 1990), as is the district court's grant of summary judgment for tort claims, Insty*Bit, Inc. v. Poly-Tech Indus., 95 F.3d 663 (8th Cir. 1996). In this diversity matter, Minnesota law guides our analysis of the substantive claims.

## I.    THE CONTRACT ISSUES

Although the parties have alleged myriad tort claims against one another, the interpretation of the Telecast Agreement is the principal issue of contention. The construction and effect given to a contract are questions of law to be determined by the court. Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 66 (Minn. 1979). "A contract is to be interpreted to give effect to the mutual intention of the parties at the time of contracting, and in so doing the language used governs if it is clear and does not involve an absurdity." Carl Bolander & Sons, Inc. v. United Stockyards Corp., 215 N.W.2d 473, 476 (Minn. 1976) (citation omitted). "In interpreting a contract, the language is to be given its plain and ordinary meaning." Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998).

Where terms in a contract are ambiguous and their meaning depends upon extrinsic evidence, interpretation of the contract should be left for the finder of fact. Turner, 276 N.W.2d at 66. A word or phrase in a contract is ambiguous if it is subject to more than one reasonable interpretation. Blattner v. Forster, 322 N.W.2d 319, 321 (Minn. 1982). The district court found that the Telecast Agreement is clear and unambiguous. We agree. The question remains, however, what effect the Twins's lease at the Metrodome had on Fox's right to broadcast games in the 2002 and 2003 baseball seasons and on the Twins's right to receive bonus payments.

The Telecast Agreement provides Fox with the option to televise Twins games during the 2002 and 2003 seasons if the Twins "secure an acceptable stadium solution, excluding a new stadium, during the Term of this Agreement." (Appellant's Confidential App. at 277.) The contract defines "Term" to mean the four baseball seasons "commencing on January 1, 1998 and ending with the completion of the 2001 season." (Id.) Fox therefore had an option to extend the term of the Telecast Agreement only if an acceptable stadium solution, other than a new stadium, existed by the end of the 2001 baseball season.

-6-

The Twins's lease at the Metrodome granted the Twins an option to continue leasing the space for the 2001, 2002, and 2003 seasons, respectively. Notably, the Twins were under no obligation to exercise any of these options and were free to leave the Metrodome after the 2000 season. Nonetheless, toward the end of the 2000 season, the Twins exercised their 2001 lease option. The district court correctly held that the act of leasing the Metrodome for the 2001 season could only be interpreted as an indication from the Twins that staying at the Metrodome was an acceptable stadium solution, triggering Fox's option right to televise Twins games for the 2002 and 2003 seasons.

The Telecast Agreement granted the Twins bonus payments of twenty-five percent of the annual license fees if "the Twins secure[d] an acceptable stadium solution or new stadium solution which secures the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years." (Appellant's Confidential App. at 278.) The bonus payment is due each year following the acceptable stadium solution.

Fox asks us to hold that the Twins are not entitled to bonus payments because they have not met the terms of this contract clause. In other words, Fox suggests that the Twins secured an acceptable stadium solution sufficient to entitle it to televise Twins games in the 2002 and 2003 seasons, but that no acceptable stadium solution existed that would have triggered the Twins's right to bonus payments. We decline Fox's invitation to define "acceptable stadium solution" differently for different sections of the contract. Rather, we adhere to the principle that "[t]erms in a contract should be read together and harmonized where possible." Burgi v. Eckes, 354 N.W.2d 514, 518 (Minn. Ct. App. 1984). Just as the Metrodome lease was an acceptable stadium solution for the purpose of triggering Fox's option rights, it was

an acceptable stadium solution for the purpose of entitling the Twins to bonus payments.[4]

The lease agreement was originally extended by the Twins to secure the Twins at the Metrodome for the 2001 season on September 27, 2000. As discussed above, the lease of the Metrodome constituted an acceptable stadium solution, qualifying the Twins for bonus payments if, as the contract required, the solution "secure[d] the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years." (Appellant's Confidential App. at 278.) On June 6, 2002, the Twins extended their lease through the 2003 season, satisfying the condition that the team stay throughout the term of the Telecast Agreement. Thus, we agree with the district court that, pursuant to the contract, the Twins are entitled to bonus payments for each season following the acceptable stadium solution – in this case, the 2001, 2002, and 2003 seasons.

## II.    THE TORT CLAIMS

Fox supplemented its complaint by alleging a number of tort claims against both Cattoor and the Twins. The Twins and Cattoor responded by filing tort counterclaims against Fox. The district court granted defense motions for summary judgment on all claims.

---

[4]We also note that in its complaint, Fox agreed that if it televised the 2002 and 2003 Twins games, it would "be obligated to pay the Twins the delineated percentage increase in annual license fees as set forth in the Telecast Agreement." (Appellant's Non-Confidential App. at 86.) Fox's admission in its pleadings casts its contrary argument to this court in an unpersuasive light. Cf. Missouri Housing Dev. Comm'n v. Brice, 919 F.2d 1306, 1314 (8th Cir. 1990) ("[A]dmissions in the pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." (quoting Scott v. Comm'r, 117 F.2d 36, 40 (8th Cir. 1941))).

## A.    Fox's Tort Claims[5]

Fox sued the Twins and Cattoor for misappropriation of trade secrets. The Minnesota Uniform Trade Secrets Act prohibits the improper acquisition, use, or disclosure of trade secrets. See Minn. Stat. §§ 325C.01-08. A "trade secret" is defined as information that "derives independent economic value . . . from not being generally known to, and not be readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." § 325C.01, Subd. 5(i). In order for the information to be protected, the owner must take reasonable efforts to maintain its secrecy. § 325C.01, Subd. 5(ii). In a suit for misappropriation of trade secrets, the plaintiff must specify what information it seeks to protect. Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 898 (Minn. 1983).

Fox cannot meet its burden of establishing that Cattoor or the Twins were privy to any of its confidential information. Fox argues that Cattoor had access to trade secrets by his knowledge of its financial information and business contacts. We disagree. First, we note that Cattoor was general manager at MSC, but had left by the time MSC was purchased by Fox. Therefore, any information Cattoor may have had related only to MSC. Fox concedes that it entered into other telecast agreements after Cattoor left, rendering Cattoor's knowledge of its financial information outdated. As the district court observed, obsolete information cannot form the basis for a trade secret claim because the information has no economic value. Further, Cattoor's knowledge of industry contact people does not rise to the level of a trade secret because this type of unprotected information is readily ascertainable within a trade. As for Cattoor's knowledge of various telecast agreements he had gleaned while at MSC, these documents are not protected because Fox's predecessor, MSC, did not

---

[5]Fox's brief is devoid of any challenge to the district court's adverse grant of summary judgment on its claims that the Twins breached a duty of good faith and fair dealing and that the Twins and Cattoor tortiously interfered with its prospective business relations. Thus, we decline to address these issues on appeal.

mark them as confidential between the parties. See Electro-Craft, 332 N.W.2d at 903 (holding no trade secret protection where none of company's relevant documents marked as confidential).

Even if Cattoor did know of trade secrets, the record contains no evidence that he used the information for the Twins's benefit. Fox speculates that it is inevitable that Cattoor will, at some future point, use confidential information for the Twins's benefit. Fox presents no evidence to support this assertion. The district court correctly granted summary judgment on Fox's trade secrets claims.

Fox also sued Cattoor individually for breach of his common law and fiduciary duties, alleging that Cattoor has misused or will misuse confidential information that he gathered during his employment at MSC. This claim is essentially a restatement of Fox's trade secrets claim. Again, Fox has failed to specify what information Cattoor was privy to, what steps it took to keep that information confidential, and how Cattoor misused the information. For the same reasons Fox's trade secrets claims fail, this claim fails as well.

Fox further alleges tortious interference with contract. To prove tortious interference, the plaintiff must show that a contract existed between the plaintiff and a third party, and that the defendant knowingly procured the third party to breach the contract without justification. Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994). The plaintiff must also show that damage resulted from the defendant's conduct. Id.

Fox claims that the defendants wrongfully contacted other sports teams that were under contract with Fox. While Cattoor did approach a number of teams about the possibility of joining Victory Sports, none of the teams changed networks – all remained with Fox. In fact, some teams have since signed new contracts to stay with Fox for an extended period of time. Fox has not adequately explained how it was damaged by Cattoor's conduct, particularly where no team left the network. Because

Fox has failed to establish the essential elements of its tortious interference with contract claim, we agree that the district court properly granted summary judgment in favor of the defendants.

## B.    Defendant Counterclaims

The Twins and Cattoor sued Fox for business defamation and defamation, respectively, based on a press release Fox issued announcing the commencement of this lawsuit. A plaintiff is entitled to relief for defamation where it is established that the defendant published a false statement about the plaintiff that harmed the plaintiff's reputation. Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980). "However, statements about matters of public concern that are not capable of being proven true or false and statements that reasonably cannot be interpreted as stating facts are protected from defamation actions by the First Amendment." McGrath v. TCF Bank Sav., FSB, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993). Thus, in analyzing a defamation claim, the court must consider the context within which the statement was made. Hunt v. Univ. of Minnesota, 465 N.W.2d 88, 94 (Minn. Ct. App. 1991).

Our independent review of the press release at issue leads us to the conclusion that it is not actionable. First, nothing in the document is actually false; the press release contains imprecise language that, at most, casts the Twins and Cattoor in a negative light. See McGrath, 502 N.W.2d at 808 (holding negative, imprecise terms will not give rise to defamation claim). The Twins argue that the press release insinuates that the Twins are seeking to leave Minnesota. A close reading of the press release makes clear, however, that Fox was merely speculating that leaving Minnesota may be an alternative that the Twins were considering, based on the Twins's claim that no acceptable stadium solution existed. See Hunter v. Hartman, 545 N.W.2d 699, 707 (Minn. Ct. App. 1996) (holding no cause of action for defamation where defendant "advocates one of several feasible interpretations of

-11-

some event"). Moreover, the context of the document – a press release from Fox announcing that it is suing the Twins and Cattoor – makes clear that the purpose of the writing is for Fox to state its case to the public. Id. at 706 ("The context of a remark, if one that would lead even the most careless listener to perceive the remark as exaggerated or imaginative commentary, may make an otherwise defamatory statement protected hyperbole.") Thus, although some of the language contained in the press release is inflammatory, it is not defamatory.

Lastly, the Twins brought related claims for unfair competition and tortious interference with prospective business relations.[6] The Twins point to evidence that Fox tried to persuade its cable operators and sports teams, particularly the Timberwolves and the University of Minnesota, to continue their relationships with Fox rather than work with Victory Sports. The Twins's best evidence to support this contention is a letter sent from Fox to Rob Moor, president of the Timberwolves. In the letter, Fox stated that it is in litigation with the Twins regarding telecast contracts, and cautioned the Timberwolves about entering into contract discussions with the Twins that would violate Fox's contract rights. Fox further stated that it would protect its contract rights with the Timberwolves, alluding to litigation.

Liability for unfair competition claims only attaches where the actor's conduct is improper. R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 571 (Minn. Ct. App. 1996). There is "no liability for interference on [the] part of one who merely gives truthful information to the other." Glass Serv. Co., Inc. v. State Farm Mut. Auto. Ins., 530 N.W.2d 867, 871 (Minn. Ct. App. 1995) (citing Restatement (Second) of Torts, § 772 cmt. b (1979)).

---

[6]Minnesota recognizes tortious interference with prospective business relations as a sub-class of unfair competition tort claims. See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632 (Minn. 1982).

The letter from Fox to the Timberwolves contained truthful information, as the Timberwolves were currently under contract with Fox, and Fox held a right of first negotiation after the contract expired. As such, nothing was improper about Fox contacting the Timberwolves to assert Fox's contract rights. Because the remaining evidence of unfair competition is too speculative to be actionable, the district court's grant of summary judgment on this claim was proper.

## CONCLUSION

As a result of extending its lease at the Metrodome, the Twins triggered Fox's option right to televise Twins games for the 2002 and 2003 seasons under the Telecast Agreement. Moreover, having satisfied the conditions of the contract, the Twins are entitled to bonus payments under the Telecast Agreement for years 2001, 2002, and 2003. We affirm the district court's interpretation of the Telecast Agreement.

No genuine issue of material fact exists on the parties' tort claims, and, finding the law to favor the defendants on each claim, we agree that the district court correctly granted defense motions for summary judgment on each claim.

Having taken the matter under advisement, we hereby deny the motion to seal briefs and appendices, and our temporary order requiring the clerk of courts to hold the briefs and appendices under seal is withdrawn.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-