Kottmyer, J.
This action is before the Court on EMC Corporation’s (“EMC”) Motion for Preliminary Injunction seeking to enforce a non-competition agreement which the defendant Jeffrey Allen (“Allen”) executed when he began working at EMC in October of 1993. Allen resigned from EMC on November 7, 1997 to take a position as “Vice President 16" with Sun Microsystems, Inc. (“Sun”). Sun is a direct competitor of EMC in the open-systems storage market and EMC alleges that Allen’s employment at Sun violates his non-competition agreement with EMC. After hearing and after consideration of the briefs, affidavits and exhibits filed in this matter, for the reasons set forth below, EMC’s motion for preliminary injunction is granted.
A.Allen’s Employment at EMC
Allen was hired by EMC as a Vice President for Marketing and Business Planning in October 1993, in EMC’s Open Systems Group. When he resigned in 1997, he was Vice-president, Channel Marketing and Support. Throughout his employment at EMC, Allen worked in senior marketing positions. Allen had access to confidential proprietary information concerning, inter alia, the capabilities of products being developed by EMC, projected release dates for these products, EMC’s marketing strategies and the terms and conditions of EMC’s agreements with resellers. Allen was compensated over $1 million dollars in salary, bonuses and stock options. EMC’s offer of employment to Allen was contingent upon Allen’s execution of the Key Employee Agreement which is the subject of this request for relief.
B.Enforceability of the Covenant
A covenant not to compete will be enforced as necessary to protect the employer’s legitimate business interests to the extent that it is reasonable in scope under the circumstances. The restriction must not be for an unreasonable length of time. In this case, in view of Allen’s position at EMC and access to confidential and proprietary information relating to EMC’s product and marketing plans for 1998, a restriction of one year is reasonable.
The geographic area covered by the covenant must also be reasonable. Here, the covenant is unrestricted. The market for open storage products in which EMC and Sun compete is worldwide. As stated by Allen in his resume, Allen’s responsibilities at EMC were “worldwide.” Accordingly, the Agreement, although not restricted to a geographic area, is reasonable in scope. The covenant is therefore enforceable to the extent necessary to protect EMC’s legitimate business interests.
C.Applicability of the Covenant
Allen strenuously argues that language of the covenant does not cover the position he has taken with Sun. In the covenant, Allen agreed that for a period of one year after termination of his employment by resignation or otherwise, he would not
directly or indirectly develop, produce, market, solicit or sell products or services competitive with products or services being offered by [EMC].
There is no question that Allen will be marketing products by Sun which are in direct competition with EMC’s data storage products. That fact does not end the inquiry, however, because the agreement goes on to provide
you shall not be considered in competition unless you have an ownership interest amounting to at least 1% in the competing enterprise ... or an officership, directorship or other policy-making executive position with a competing enterprise.
By letter dated October 31,1997, as amended by letter dated November 6, 1997, Sun offered Allen the position “Vice President 16.” At Sun Allen will direct marketing for the Storage Products Group, a sub-product group with the Enterprise Storage & Service Group.
Sun, a company of over 21,000 employees, has approximately 110 Vice Presidents. At Sun, Allen will be responsible for world-wide marketing of Sun’s storage products, including open systems products, his area of specially for EMC. He will be the spokesperson for the Storage Products Group. Allen’s compensation package is consistent with that of an officer, a sign-on bonus of $115,000, a base salary of $215,000, participation in the Vice President’s Bonus Program (with a targeted payment of 42% of annual salary), stock options (subject to approval of the Board Directors) and relocation benefits, lire offer was accepted by Allen on November 11,1997.[1] Even assuming a higher cost of living and average per-capita income in Silicon Valley, the compensation package is commensurate in value and in the type of compensation and benefits with that of an officer.
The defendant argues that under Delaware law, Allen is not an officer of Sun. The Agreement is silent as to the controlling law. Based on the facts, Massachusetts law controls the interpretation of the agreement which arose out of an Agreement for employment in Massachusetts. Massachusetts law therefore governs the interpretation of the word “officer” as used in the Agreement. The plain meaning of that word includes an individual who holds a position as vice president.
The defendant argues that under Massachusetts choice of law, Delaware law controls the determination whether Allen is an officer of Sun. If defendant’s argument were correct, the meaning of the word “officer” as used in the covenant would vary depending on, and would require analysis of, the law of the state of *23 incorporation and bylaws of the company in question. This result reinforces my view that had the drafters not intended that the word “officer” be given its plain and ordinary meaning, they would have defined the term.
The defendant argues that Allen is not an officer of Sun, as that term is used in the Agreement, because the Agreement applies only to officers who are also policy-makers or to those executives involved in making policy. He contends that at Sun he will not make policy and therefore even if he were an officer of Sun, he would not be in violation of the covenant not to compete because it covers only those officers who make policy. Because Allen’s position at Sun involves policy-making at an executive level, this is a distinction without a difference, but I will address briefly each of Allen’s contentions given the existence and implications of Allen’s agreement with Sun for alternate employment in the event that the injunction is granted.
First, I do not find the agreement ambiguous. The language “officer, director or other policy-making executive position” refers to all corporate officers, all directors and all other executives holding policy-making positions. This interpretation does not render the word “other” superfluous. The word “other” performs the function of signifying the author’s understanding that officers and directors occupy policy-making positions. The omission of the word “other” would create the implication that officers and directors are not policy-making executives.
Nor does this interpretation render superfluous the words “officer” and “director.” The language attempts to draw a bright line presumably for the dual purpose of 1) providing, to the extent feasible, clear guidelines for the job-hunting covered employee and 2) avoiding, to the extent feasible, disputes over the applicability to particular situations of the more amorphous phrase “policy-making executive position.” The inclusion of the language “other policy-making executive” ensures that an enterprising employee cannot avoid the reach of the covenant by taking a highly compensated high-level position and foregoing the title which would ordinarily accompany the position.
For these reasons, I conclude that an officer of a corporation, like a Vice President, is a covered employee.
Even if Allen were not an officer with the meaning of the agreement, there is a substantial likelihood that EMC will succeed at trial in establishing that the position he has accepted at Sun, “Vice President 16,” is a policy-making executive position within the meaning of the agreement. According to the offer letter, Allen is expected to bring “leadership and expertise to [EMC’s] management team.” At Sun, Allen “will be in charge of setting objectives consistent with higher level policy decisions and make sure that plans are created and implemented to achieve these objectives.” (Charbrier Decl. ¶19.) The evidence submitted establishes that Allen would have responsibility for all marketing activities of the Sun’s Storage Products Group and would be a “key member” of the storage business strategy team. His responsibilities for the position are described in the recruitment memorandum to include responsibility for developing the department’s marketing strategy by setting objectives, identifying target markets and customers, establishing competitive pricing plans, developing plans to foster growth in revenues and personnel and acting as liaison with other marketing groups. According to the recruitment memorandum, evaluation of Allen’s performance will be based on revenues, market share and team management and leadership, among other things. Allowing for some “puffing" by the recruiter, the memorandum and ¶19 of the Charbrier Deck describe essentially the same executive position. While the affidavits submitted by Allen establish that there are at least two levels between Allen and those with final say over issues like price, I do not read the Agreement as applying only to executives charged with final decision-making authority. In a multi-faceted company like Sun those final decision-makers must rely heavily on the recommendations made by executives of individual groups or departments in question. Allen will be one of the highest ranking managerial employees and the spokesperson for Sim’s storage products group, a leader of the management team. He will develop and implement the marketing strategy for products which are in direct competition with EMC. He will be one of only 110 Vice Presidents at Sun. As such, in my view, he will be a policy-making executive in a competing company within the meaning of the Agreement.
D. EMC’s Legitimate Business Interests
A covenant not to compete will be enforced only to the extent that it protects an employer’s legitimate business interests. In this case, EMC has demonstrated a substantial likelihood that it will succeed in establishing that Allen’s employment at Sun will involve the use of EMC’s confidential and proprietary information on a competitor’s behalf. It is undisputed that Sun and EMC are in head-to-head competition in the open systems storage marketplace. Further, Allen would be in charge of marketing systems in competition with EMC’s systems in the world-wide market. As an officer of EMC with substantial responsibility for marketing storage systems, Allen had access to a wealth of information concerning product development, pricing and marketing plans which is confidential and proprietary to EMC. For example, Allen had access to EMC’s Monthly Engineering Reports which provide detailed information concerning EMC’s ongoing engineering projects. While some of the information in these reports is highly technical in nature, much of the information is clearly within Allen’s ken.[2] Examples include the nature of products under development and priority assigned to them, the problems encountered in developing them, what they will and will not do and their projected release dates. In addition, Allen is knowledgeable about the terms and conditions of EMC’s agreements with its business *24 partners. Although Allen could be enjoined from dealing with EMC’s partners, his knowledge of the terms of EMC's partnership agreements, including pricing, support and the like, and current marketing strategies of EMC and its partners, including amounts budgeted for 1998 and the allocation of these amounts, would provide a significant advantage to Sun in formulating its own marketing plans and enable Sun to harm EMC in the market or with other EMC partners.
I further find that no injunction can feasibly be drafted and enforced which will protect EMC’s legitimate business interest in protecting its confidential and proprietary information from disclosure. In performing his duties at Sun, Allen’s decisions and recommendations will necessarily be informed by his knowledge of EMC confidential and proprietary information. Given the fact that EMC and Sun are in direct competition to fulfill the same need in the same marketplace, Allen’s employment at Sun will irreparably harm EMC.
E. The Relative Equities/Public Interest
The agreement is enforceable and applicable. EMC will suffer irreparable harm if the agreement is not enforced. The agreement itself provides that it is enforceable by injunction. Enforcement will create a personal hardship for Allen and his family because the process of relocating his family has begun and the job at Sun offers Allen a substantial career opportunity.
Apart from the distance involved, however, the harm to Allen is no different from that suffered by the employee in virtually every case in which a covenant not to compete is enforced. If personal hardship like that which will result from enforcement in this case constituted irreparable harm overcoming the employer’s legitimate business interests, the protection afforded by covenants not to compete would be meaningless.
The public interest favors enforcement of contractual obligations voluntarily entered into for consideration. Allen was recruited by EMC. During his four-year employment Allen received over $1 million in compensation from EMC. He was employed when he received EMC’s offer of employment. The offer made the terms of Agreement a condition of his employment at EMC. He had the option of rejecting the offer and continuing in his current employment.
2. Unclean Hands
The record in this case will not support denial of the injunction on the basis of unclean hands on the part of EMC or judicial estoppel. EMC’s conduct in the Goldberg case and its pursuit of a litigation position in that case which is inconsistent with the position taken in this case is a matter of concern to the Court. However, given the length of time which has elapsed since the Goldberg case and the differences in the facts of the two cases, application of the doctrine of unclean hands is not appropriate in this case. There is no evidence that Allen was aware of or relied upon the position taken by EMC in the Goldberg matter. Further in his affidavit in the Goldberg case, EMC’s Chairman did not address the question whether Goldberg was an officer.[3] The Court does not hereby adopt EMC’s argument that, as a matter of law, its conduct vis a vis employees of its competitors covered by covenants not to compete is not relevant to the question whether it is entitled to seek relief from a court of equity when its own covenants are violated.
CONCLUSION
For the reasons stated herein, I find that EMC has demonstrated a likelihood of success on the merits and that it will be irreparably harmed if Allen’s covenant not to compete is not enforced. Accordingly, it is hereby ORDERED:
The defendant Jeffrey E. Allen be and hereby is enjoined from
1) using or disclosing any EMC information not already lawfully available to the public concerning any EMC products, product development, business strategy, financial information, customer lists, or other information which EMC treats as confidential and/or proprietary:
2) being an officer or director or having any other policy-making executive position with Sun Microsystems, Inc. or any other company which produces, markets, solicits or sells products competitive with or services being offered by EMC for the twelve-month period following his resignation from EMC.

By memorandum dated November 2, 1997, Allen commented on various provisions of the offer letter. In that memorandum, he referred to discussions with Steve Rein (the recruiter) and Sun’s Kathleen Holmgren regarding the potential need for Sun to defend him in the unlikely event that “EMC decides to try and enforce their non-compete clause.” In the amended offer, EMC undertook to pay Allen’s legal fees and expenses “in the event that EMC initiates action against you to enforce their limited Non-Competition Clause.” Sun also agreed that, in the event an injunction was granted, Allen would receive alternate employment at Sun.

One of Allen’s functions at Sun will be to “serve as a key conduit of information to technical groups within SMCC from the SMCC sales force and customer base and from commercially available research.” Charbrier Decl. ¶19.

An unambiguous statement by EMC that Goldberg, a Vice President of EMC, was not an officer within the meaning of the non-compete clause in issue in the Goldberg case would constitute evidence of EMC’s understanding of the meaning of that term as used in Allen’s Agreement given the similarity of the language in the two Agreements. Because in my view the language of the Agreement is not ambiguous, however, the inquiry does not go beyond the plain and ordinary meaning of the word.