Brassard, J.
This case arises out of a dispute over a covenant not to compete in an employment contract between plaintiff Cereva Networks, Inc. (“Cereva”) and defendant Timothy Lieto (“Lieto”). Cereva has brought suit against Lieto and defendant Pirus Networks, Inc. (“Pirus”) alleging breach of contract (Count I) as to Lieto, tortious interference with contractual relations (Count II) as to Pirus, unfair or deceptive acts or practices in violation of G.L.c. 93A (Count III) as to Pirus, civil conspiracy (Count IV) as to both Lieto and Pirus, and misappropriation of trade secrets, confidential and/or proprietary information (Count V) as to both Lieto and Pirus. Cereva now moves for a preliminary injunction pursuant to Mass.R.Civ.P. 65. Cereva specifically seeks to enjoin Lieto from violating his non-competition and non-disclosure obligations as set forth in his employment agreement with Cereva. After hearing and for the following reasons, Cereva’s motion for a preliminary injunction is ALLOWED.
BACKGROUND
Cereva, founded in 1998, is a Massachusetts corporation located in Marlborough, Massachusetts. For the past three years, Cereva has been engaged in developing and marketing a comprehensive computer infrastructure system that integrates high-speed data networking, data management, and intelligent data storage. Cereva contends that its system is designed to enable users to quickly and efficiently access, manage and store information, so as to maximize storage capabilities, simplify their infrastructure, and reduce costs.[2]
In March 2000, Lieto was hired by Cereva as its Vice-President of Sales and Service. Upon beginning his employment with Cereva, Lieto executed a Non-competition, Nonsolicitation, Nondisclosure and Developments Agreement (“the Agreement”) with Cereva. Pursuant to the Agreement, Lieto agreed that for one year after termination of his employment with Cereva, *695 he would not “engage in any business activity which is in direct competition with the products or services being developed, manufactured or sold by [Cereva] at the time of [his] employment.” Lieto also agreed that he would not “solicit or do business with any customer of . . . [Cereva] or any potential customer of . . . [Cereva] with whom [he] [had] contact so as to be in direct competition with the products or services being developed, manufactured or sold by. . . [Cereva] at the time of [his] employment.” Lieto further agreed that he-would not disclose any of Cereva’s confidential information or company documentation, or use any information or documentation unless he was engaged in transactions on behalf of Cereva.
Cereva asserts that as Vice-President of Sales and Service at Cereva, Lieto served as a member of Cereva’s senior executive management team. This team was charged with the responsibility of bringing Cereva’s product into the market. As a member of the senior executive management team, Lieto performed numerous job functions that Cereva contends enabled him to become privy to confidential information. First, he was entrusted with the creation of presentations to potential investors which presentations required knowledge of Cereva’s entire “road map.”[3] Second, Lieto was a member of the product change control team. This team had sole decision-making authority regarding modifications to Cereva’s product. Membership on the product change control team provided Lieto with confidential information dealing with the progression and evolution of Cereva’s product.
Cereva contends that Lieto also served as a member of Cereva’s pricing group. This group established discount and pricing procedures for Cereva’s product, causing Lieto to be involved in shaping all aspects of Cereva’s product from the costs of raw materials to the percentage of the mark-up on the product. Most importantly, Cereva argues that Lieto was granted access to Cereva’s pipeline report. This report identified each sales team’s most recent customer contacts, their forecast of sales opportunities with each customer, and the estimated revenues to be generated from anticipated sales to each customer. In sum, Cereva contends that Lieto had unrestricted access to voluminous amounts of customer information necessary to effectively sell Cereva’s product.
Lieto contends that upon being hired by Cereva, Cereva’s Chief Executive Officer and Chief Technology Officer informed Lieto that its products would be ready for beta testing[4] to its customers in August 2000. Lieto alleges that contrary to Cereva’s representations, Cereva’s product was not ready for beta testing in August 2000. As a result of this failure, Lieto alleges that his job at Cereva became difficult causing him financial damage. In addition, Lieto alleges that in June 2001, he became increasingly worried since Cereva was not only unable to launch its product but was laying-off large numbers of employees, causing tension and conflict at the company.
In May 2001, Richard Napolitano (“Napolitano.”), CEO of Pirus, contacted Lieto regarding a sales management opportunity at Pirus. Pirus is a Massachusetts corporation located in Acton, Massachusetts and is engaged in the business of computer data storage. Lieto contends that he was completely aware of the Agreement that he signed with Cereva, but was unsure as to whether Pirus was a direct competitor with Cereva. On July 17, 2001, Lieto resigned from Cereva, effective July 31, 2001, and began employment at Pirus on September 4, 2001.
DISCUSSION
I. Standard of Review
In order to succeed in an action for a preliminary injunction, a plaintiff has the burden of proving: (1) a likelihood of success on the merits at trial; (2) that irreparable harm will result from the denial of the injunction; and (3) that the plaintiff s irreparable harm outweighs any harm the opposing party would suffer if the injunction were granted. Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001); Packaging Industry Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).
II. Success on the Merits
A. Direct Competition
The main dispute among the parties is whether Cereva and Pirus are in “direct competition” with each other within the meaning of the Agreement. Cereva asserts that it is in direct competition with Pirus since both products are designed to provide improved data management and control as well as incremental data stability, and to minimize costs of implementation and maintenance. Cereva concedes that Pirus incrementally increases storage space by adding storage disks provided by other vendors, while Cereva utilizes its own incremental storage. Despite this difference between the two entities, Cereva maintains that it targets the same markets as Pirus and points out that a customer seeking to improve its current data storage networking systems would not purchase both a Pirus product and a Cereva product. Instead, the customer would choose one product because both products provide the same overall solution to outdated networking systems. Cereva contends that its product allows the customer to replace its first generation technology entirely while the Pirus product enhances a first generation product through its integration. Cereva relies upon a number of its submissions which suggest that Cereva and Pirus are direct competitors.[5]
Lieto and Pirus assert that Pirus is not in direct competition with Cereva. Lieto and Pirus argue that while both companies participate in the computer storage industry, Pirus does not target the same customers as Cereva- and operates in completely different segments of the industry. Specifically, Pirus *696 contends that unlike Cereva’s product, its product has no storage capacity of its own. Pirus’ product allows for communication between different servers and storage systems, and thus enables a customer to transfer its data and information among different server and storage systems. However, unlike Cereva's product, Pirus’ product does not contain its own disk array of storage. Pirus also contends that Cereva’s product is not capable of transferring information between servers or systems made by other vendors, while this capacity is the key feature of the Pirus product. Pirus analogizes the difference between the two companies’ products to that of a transmission and an automobile. Pirus contends that its product is similar to the transmission in a car, in that its product is analogous to this small part of the car that facilitates its operation. Cereva’s product, this argument runs, would be the car itself. Therefore, following this analogy, a Ford dealership engaged in the business of selling new or used cars would not be in direct competition with AAMCO Transmission or Lee Myles Transmission, entities which are engaged in the business of transmission repair and installation.
In addition, Pirus argues that the Cereva product is both different in price and form from its own product. First, as to price, Pirus contends that its product is marketed for a sales price between $50,000.00 and $200,000.00 while the Cereva product is priced between $1,000,000.00 and $4,000,000.00.[6] Second, the Pirus product stands one foot high and closely resembles a microwave oven. The Cereva product stands seven feet high and closely resembles a mainframe computer. Pirus concludes that its product would be suitable for a customer seeking to increase the functionality of its existing storage systems, while Cereva’s product would be more appropriate for a customer who is looking for a complete next generation storage solution of substantial size.
Pirus points to the fact that Cereva’s submissions indicating that Pirus and Cereva compete are not accurate since they broadly list companies in the same generally defined area of the computer storage industry.[7]
Massachusetts appellate courts have not had the opportunity to thoroughly address the term “direct competition” in the context of covenants not to compete. Accordingly, this court is guided by persuasive authority from other courts, both state and federal.
In Avery Dennison Corp. v. Kitsonas, 118 F.Sup.2d 848 (S.D.Ohio 2000), the plaintiff corporation brought suit against a former employee seeking to enforce an employment contract containing a covenant not to compete clause and a customer secrecy clause. The defendant argued that his current employer and previous employer were not in direct competition with each other and, as such, the covenant not to compete in the employment agreement was invalid. Id. at 853. Specifically, the defendant argued that the two entities were not in competition with each other because the defendant’s previous employer did not manufacture a product that his current employer did manufacture. Id. at 853. The United States District Court for the Southern District of Ohio (Marbley, J.), held that:
One corporation does not need to manufacture identical products to be in direct competition with another corporation. Although RM-EAS and AM-EAS are different products, they are substitutes for one another that is, a retailer would use either RM-EAS or AM-EAS technologybut not both.
Id. at 853.
This case is persuasive because it analyzes the term “direct competition” by focusing on the needs of the customer. In the instant case, Cereva and Pirus are in direct competition not because they manufacture identical products, but because a consumer wanting or needing to update its data storage would turn only to one of these entities’ products to solve its problems. Purchasing both of these products would not be a sensible third course.
In Uncle B’s Bakery, Inc. v. O’Rourke, 920 F.Sup. 1405 (N.D.Iowa 1996), a bagel manufacturer brought suit against a former employee and the competitor that hired him,- alleging misappropriation of trade secrets. The former employee had signed a covenant not to compete with the plaintiff that barred him from seeking employment with a direct or indirect competitor within five hundred miles of the plaintiffs marketing outlets during employment with the plaintiff and for a period of five years following termination with the plaintiff.[8] Id. at 1415. The plaintiff then moved for a preliminary injunction seeking to enjoin the defendant’s violation of the non-competition agreement and the defendant’s misappropriation of trade secrets. Id. at 1410. The defendant corporation argued that it did not compete directly with the plaintiff because the defendant corporation produced bagels sold in the frozen food section of supermarkets while the plaintiff produced bagels sold in refrigerator cases, as well as in fresh bread, deli, and bakery sections of grocery stores. Id. at 1412.
The United States District Court for the Northern District of Iowa (Bennett, J.), held that to a consumer, “grocery store bagels are grocery store bagels.” Id. at 1412. The court pointed out that the companies might not be considered “direct competitors” if one entity sold grocery store bagels, while the other entity sold bagels on site in its own bakery outlets or franchised restaurants. Id. at 1412. The court further found that the two entities sold bagels to the same store chains, in almost identical nationwide geographical markets and as such were “direct competitors.” Id. at 1412.
As discussed above, courts have focused on the customer and to whom the product is marketed in determining the meaning of “direct competition.” In EMC Corp v. Allen, Civil No. 975972, 8 Mass. L. Rptr. 21 (Mass. Super. Ct. Dec. 15, 1997), this court *697 (Kottmyer, J.) held that two companies engaged in the computer data storage industry were in direct competition because both entities were attempting to “fulfill the same need in the same marketplace.” Following the holding in the above cases, this court concludes that Cereva and Pirus are engaged in the storage networking industry and both market to the same customer base. Accordingly, Cereva and Pirus do compete with each other directly.[9]
With respect to the issue of the difference in price between the two products, entities can be in direct competition with each other despite the difference in price between the products that they offer. See Lumex, Inc. v. Highsmith, 919 F.Sup. 624, 631 (E.D.N.Y. 1996) (holding that products dissimilar in price can have similar features so as to compete with each other).
B. Covenants Not to Compete
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. See Novelty Bias Binding. Co. v. Shevrin, 342 Mass. 714, 716 (1961). Such legitimate business interests might include trade secrets, other confidential information, or, the good will the employer has acquired through dealings with its customers. See All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974). Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. See Richmond Bros., Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
Good will is a broad term and encompasses a variety of intangible business attributes such as the “name, location and reputation, which tends to enable the business to retain [its] patronage.” Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961) (citations omitted). An employer’s positive reputation or position in the eyes of its customers or potential customers is an element of good will. See Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-89 (1974). Good Willis also generated by repeat business with existing customers. Id. Good will is a legitimate business interest that an employer is entitled to protect. See Kroeger v. Stop & Shop Co., Inc., 13 Mass.App.Ct. 310, 316 (1982). In Marcam Corp. v. Orchard, 885 F.Sup. 294, 297 (D.Mass. 1995), the Court (Lindsay, J.), held:
The problem for [plaintiff] is that when [defendant] goes to [competitor] he does not go with a tabula rasa with respect to [plaintiffs] products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive how all of the information stored in [defendant’s] memory can be set aside as he applies himself to a competitor’s business and its products. On the contrary, what [defendant] knows about [plaintiff] is bound to influence what he does for [competitor], and to the extent it does, [plaintiff] will be disadvantaged.
This court concludes that Lieto was involved in all aspects of Cereva’s sales initiatives which involved interaction with all of Cereva’s major customers and prospects. Lieto clearly had access to customer lists, pipeline reports, and customer trip reports. As Vice-President of Sales and Service, Lieto obviously worked on promoting Cereva’s product and fostered good will with potential customers. Cereva is justified in protecting this established good will as a legitimate business interest.
A non-competition agreement, to be enforceable, also must be reasonable in geographical scope and length of time. See Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228 (1975). In this instant case, the covenant not to compete is in effect for one year. Massachusetts appellate authority holds that a two-year restriction, following termination of employment is reasonable. See All Stainless, Inc. v. Colby, 364 Mass. 773, 779 (holding that a covenant not to compete for two years was enforceable). As such, a covenant not to compete containing a one-year restriction, as in the instant case, is clearly reasonable with respect to length of time. In EMC Corp v. Allen, Civil No. 975972, 8 Mass. L. Rptr. 21 (Mass. Super. Ct. Dec. 15, 1997), this court (Kottmyer, J.) was presented with facts analogous to those in this case. In addition, the EMC Corp. case involved companies engaged in the same type of business as Cereva and Pirus. This court stated, “in view of [defendant’s] position at EMC and access to confidential and proprietary information relating to EMC’s product and marketing plans ... a restriction of one year is reasonable.” Id. This court further held that, ”[t]he market for open storage products in which EMC and Sun [the subsequent employer] compete is worldwide.” Id. The covenant not to compete in the Agreement at bar is likewise reasonable in geographical scope and length of time.
III. Irreparable Harm
Cereva has made a showing that it will suffer irreparable harm if an injunction fails to issue since it stands to lose customer good will which cannot be completely remedied through monetary damages. See Kroeger, supra, at 322 (holding that the task of quantifying the consequences of violating a non-competition clause is a particularly hard and elusive one).
IV. Balance of Harm
This court is well aware of the harm that will befall Lieto and his family by this injunction. This injunction will also impact Pirus. However, Lieto was completely aware of the Agreement that he signed when he joined Cereva and knew that he was subject to a covenant not to compete in the Agreement. If Lieto’s harm were to outweigh Cereva’s harm, then it would render agreements of this nature unenforceable and start up businesses such as Cereva and Pirus would never be able *698 to protect against this type of situation. Cereva has demonstrated that its potential for harm outweighs any harm to Lieto.
ORDER
For the foregoing reasons, this court finds that Cereva has demonstrated a likelihood of success on the merits and that it will be irreparably harmed if Lieto’s covenant not to compete is not enforced. Accordingly, it is hereby ORDERED that:
The defendant Timothy Lieto be and hereby is enjoined for a period of one year from his last day of employment with Cereva Networks, Inc. from
1) directly or indirectly, alone or as a partner, officer, director, employee or stockholder of any entity, (i) engaging in any business activity which is in direct competition with the products or services being developed, manufactured or sold by Cereva Networks, Inc. at the time of his employment, (ii) soliciting or doing business with any customer of Cereva Networks, Inc. or any potential customer of Cereva Networks, Inc. with whom he has had contact so as to be in direct competition with the products or services being developed, manufactured or sold by Cereva Networks, Inc. at the time of his employment.
The defendant Timothy Lieto is further enjoined from
(1) using and/or disclosing to anyone, any of Cereva Networks, Inc.’s confidential information, including trade secrets.

 Cereva asserts that its system will enable users to incrementally and upon demand add enormous amounts of storage space.

 Cereva asserts that this “road map” included knowledge of Cereva’s customer base, plans for targeting additional customers, strategic partnership efforts, product and marketing strategies as compared to those set forth by competitors, customer support programs under development, sales strategies being pursued, and feedback being received from customers regarding Cereva’s product.

 Beta testing is a process utilized in detecting and correcting various bugs prone to computer software when it is released. See Edward W. Bulchis & Maurice J. Pirio, Preserving Intellectual Property Rights During Software Beta Testing, 7 Computer Law No. 6, 1, 4 (1990).

 Specifically, Cereva points to materials from both the Cereva and Pirus websites, as well as other internet sites that contain articles and information pertaining to the computer data storage industiy.

 Cereva counters this argument by stating that the price quoted by Pirus as to Cereva’s product is the cost of Cereva’s product at full capacity. Cereva plans to offer a start-up version of its product with significantly less storage capacity than the entire full-scale Cereva product.

 Pirus specifically points to a company on the Byte and Switch list submitted by Cereva that cannot possibly compete with Pirus or Cereva since its product is only ten inches long and five inches wide and sells for approximately $3,000.00. This company is nonetheless listed as a competitor of Cereva and Pirus.

 The covenant not to compete stated:
NON-COMPETE It is expressly understood and agreed that during Employee's training and employment. Employee will be exposed to Employer’s Trade Secrets and Confidential Information and will therefore become a valuable asset. Employee expressly agrees and covenants not to compete directly or indirectly, nor have an interest in any business, corporation or other entitly which competes directly or indirectly, nor work for any person, business, corporation or other entity which competes directly or indirectly with Employer within a 500 mile radius of any of Employer’s marketing outlets either during the term of Employee’s employment or for a period of five years thereafter.

 This court is familiar with Massachusetts case law that holds that the meaning of contract terms, when placed in doubt, are to be construed against the drafter of the document, which, in this case, is Cereva. See Garnick & Scudder, P.C. v. Dolinsky, 45 Mass.App.Ct. 925, 926 (1998). Cereva’s request for a preliminary injunction would be more compelling if “direct competition” had been defined to include, but not be limited to, certain companies.