Roach, Christine M., J.
Plaintiff seeks injunctive relief to prevent Defendant, a former employee, from engaging in allegedly unfair competition, in violation of two covenants entered into during his employment, as well as common-law preclusions from misappropriation of trade secrets and confidential business information.[1] The parties appeared on an agreed-upon short order of notice for non-evidentiaiy hearing February 13, 2013. Following the hearing and review of all materials, including those which have been impounded,[2] Plaintiffs motion is ALLOWED.
Undisputed Preliminary Facts[3]
Plaintiff EMC seeks to enforce two agreements it has with Defendant Mr. Breen, who most recently worked as Senior Vice President, Sales, Unified Storage. EMC’s business is to develop, manufacture and market hardware, software and related services that allow customers to store and protect electronic information. Breen began working for EMC in 1986, and rose steadily through the ranks of its sales organization, occupying a range of senior sales roles from District Sales Manager to his last title.
The first document, entitled Key Employee Agreement (KEA), was dated March 2012, and executed by Breen in July 2012, having changed sales roles at EMC. The relevant provision states that, as an employee “at the director level or above,” and for the twelve-month period following the effective date of the termination of his employment with EMC, Breen agreed he would “not, directly or indirectly, provide any services ... to any entity that is developing, producing, marketing, soliciting or selling products or services competitive with . . . any EMC business unit, division, department or product line for which you performed any work or about which you obtained Confidential Information during the two-year period prior to your last day of active employment” Complaint, at Exhibit 1, para. 1(b) (emphasis supplied). Confidential Information is also defined in the agreement, as “any information not already lawfully available to the public concerning [EMC] or any information constituting a trade secret . . . includ[ing], without limitation, any . . . product specification, or plan for a new, revised or existing product; any business, marketing, financial, pricing or other sales-related data, information regarding the present or future business or products of [EMC] . . . and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities.” Id. at para. 3 (emphasis supplied).
The second document at issue is a severance agreement identified by the parties as the Sept. 2012 Agreement. McCarron Affidavit, at Exhibit A. The Sept. 2012 Agreement is a letter agreement dated September 13, 2012, and executed by Breen on September 29, 2012. The Sept. 2012 Agreement provides at paragraph l.(a) that Breen’s active employment with EMC shall end on August 31, 2012. The Sept. 2012 Agreement goes on in paragraphs 2-5 to provide Breen with ongoing weekly payments and other benefits for a one-year period (until August 30, 2013), during which time Breen could also seek other employment. The Sept. 2012 Agreement terminates sooner than August 2013 in the event Breen accepts other employment or breaches the Agreement. Id., at para. l.(a)(ii)-(iii). At paragraph 5, the September 2012 Agreement states as follows:
You agree that the Key Employee Agreement (“KEA”) between you and EMC executed by you on July 11, 2012 shall be in full force and effect and is hereby ratified, confirmed in all respects, incorporated into and made part of this Agreement. . . The KEA will remain in effect during the period of pay continuation . . . and for a period of 12 calendar months thereafter.
Thus, one practical effect of the severance agreement for our purposes is to extend the onset of the one-year non-compete now at issue in this case, from August 2012 to January 2013.[4]
In December 2012, Breen notified EMC that he intended to go to work for a competitor of EMC, Oracle Corporation, beginning January 2, 2013, as a Senior Vice President, North America Hardware Sales. Oracle offers certain hardware products that compete directly with EMC’s products, in particular with respect to data storage.
Specific customer good will is not an issue in this case, because Breen has not had direct customer contact on behalf of EMC for many years. Nor does EMC assert Breen has physically carried away (electronically or otherwise) proprietary EMC materials that must be returned. Rather, EMC seeks to enforce the covenants on the basis of proprietary business information it alleges Breen accumulated over his final two years of senior employment in its sales organization (following upon more than two decades of progressively senior sales work), and which EMC alleges Breen would inevitably (however inadvertently) disclose to Oracle, with regard to the high-level sales strategies and plans of EMC.
Breen in turn does not challenge the consideration[5] he received for the covenants, or the reasonableness of a one-year duration per se. Rather, Breen argues the non-compete is unenforceable against him because none of the allegedly proprietary information identified by EMC to which he was exposed is a protectable business interest as a matter of law, and therefore it cannot serve as a basis for sustaining the *116 covenant. Breen further argues that the one-year duration is unreasonable on the facts of this case, that he and Oracle have taken appropriate steps to ensure his role for Oracle is materially different than the work he did for EMC, and that appropriate safeguarding agreements are also in place between him and Oracle.
Legal Standards
A covenant not to compete is enforceable in Massachusetts only if and to the extent it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest. Boulanger v. Dunkin’ Donuts, Inc., 442 Mass. 635, 639 (2004); Marine Construction Co., Inc. v. Hurley, 365 Mass. 280, 287-89 (1974). Such covenants are valid if they are reasonable in light of the facts of each case. All Stainless, Inc. u. Colby, 364 Mass. 773, 778 (1974).
Even in the absence of an enforceable agreement, the traditional fiduciary obligations owed to any employer include an obligation not to reveal to third parties the confidential information one obtains during the course of his employment. Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 839-42 (1972). However, an employee may carry away and use general skill or knowledge acquired throughout his career as well as during the course of his particular employment. Id. This may include his own memory of customer names and purchasing habits, and general market information, but not tangible lists or other confidential internal records of the employer. J.T. Healy & Son., Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 731 (1970); American Window Cleaning Co. of Springfield, Mass. v. Cohen, 343 Mass. 195, 199 (1961); New England Overall Co., Inc. v. Woltmann, 343 Mass. 69, 76 (1961). In Massachusetts, this “carrying away” must also comport with our statutory protection of trade secrets. G.L.c. 93, section 42; G.L.c. 266, section 30(4).
With respect to an employee’s subjective memory, Massachusetts courts have also considered the need to guard against so-called inadvertent disclosure. Aspect v. Software, Inc., 787 F.Sup.2d 118, 130 (D.Mass. 2011); Lombard Med’l Tech., Inc. v. Johannessen, 239 F.Sup.2d 729, 442 (2010); C.R. Bard, Inc. v. Intoccia, 1994 WL 601944, at *3 (D.Mass. 1994); Boulanger, 442 Mass, at 579, n.12; Lffelmage, Inc. v. Brown, No. CV 2011-3764 (Mass.Super. Dec. 22, 2011), at *8 (McIntyre, J.) [29 Mass. L. Rptr. 427); Architext, Inc. v. Kikuchi, 2005 WL 2864244 (Mass.Super. May 19, 2005), at *3 (Lowy, J.) [20 Mass. L. Rptr. 127] (doctrine of inevitable disclosure may be appropriate in situation of direct competitor and significant likelihood of trade secrets).
Confidential business information may be determined to be a legitimately protectable business interest to support a covenant. With respect to this alleged interest, a court considers: “(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.” Jet Spray Cooler, 361 Mass, at 840. However, “agreements] cannot make secret what is not secret, and it remains for the court to determine whether an alleged trade secret is in fact such.” Dynamics Research Corp. v Analytic Sciences Corp., 9 Mass.App.Ct 254, 277 (1980).
As moving party, EMC must persuade the court that the combination of its likelihood of success on the merits on its claim for unfair competition, with the risk of irreparable harm to it, outweighs both the risk of irreparable harm to Breen from the requested injunction, and Breen’s own likelihood of success on the disputed issues. John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass. 124, 130 (1990); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1990). I find and rule Plaintiff has met its burden on this preliminary record.
Discussion and Rulings Job Descriptions
The first material dispute of fact, not surprisingly, is the content of Breen’s work at EMC, the material to which he was exposed, and how that compares to his anticipated job with Oracle. The parties have submitted competing affidavits on this question.
As is often true for an employee defendant in a non-compete case, Breen is in the awkward position of minimizing the scope, access and importance of his prior roles for EMC. Thus, although he most recently served as Senior Vice President, Sales, Unified Storage, Breen testifies he wasn’t directly or personally involved in long-term marketing strategy, as EMC alleges. Breen Affidavit, at paras 21-22. Breen’s putative new supervisor, Oracle Senior Vice President Matthew Mills, testifies that “the real reason Oracle has employed Mr. Breen is because of his considerable experience in running a systems or hardware sales organization, managing and motivating sales people, and executing a sales plan.” Mills Affidavit at para. 11 (emphasis in original). Moreover, Breen distinguishes between “core” or “field” sales (which he proposes to do for Oracle), and “overlay,” or supporting product promotion internally to colleagues, which Breen most recently did at EMC. Breen Affidavit at paras. 10, 16-21.
EMC, who of course bears the burden, testifies both through Napolitano (President, Unified Storage Division), and Scannell (President, Global Sales and Customer Operations), that Breen was actually involved in, and thus acquired extensive knowledge about, the “methodology” of EMC’s marketing pro *117 grams, sales campaign strategy for particular new products, and detailed pricing data and pricing margins for different types of customers. Specifically, the EMC witnesses allege Breen was responsible for developing and executing the “go to market” sales strategy and support for the principal EMC “Mid-Tier” storage platform known as VNX, a product with which Oracle is in direct competition. Napolitano Affidavit at paras. 2-4; Scannell Affidavit at paras. 9-16. They testify Breen regularly attended executive level meetings on all of these topics. In short, EMC’s position is that Breen is “deeply cognizant of information known nowhere else,” Scannell Affidavit at para. 10, and that essentially everything Breen knows about storage product sales he learned through EMC’s methodology, as he is a career EMC veteran and has had first-hand access to no one else’s strategic sales culture. Id. at para. 16. While respecting the distinction betweenfield and “overlay” sales, I nonetheless must rule that EMC has met its burden to demonstrate on these preliminary facts that Breen’s new employment with Oracle is in direct competition with his old employment at EMC.
Confidential Information
Breen has repeatedly made three arguments about the allegedly confidential EMC information: that the information identified is not the sort that is secret or protectable; that whatever EMC marketing strategies he knows are stale; and/or they are de minimus. Upon due consideration of the material presented, none of these arguments may prevail. First, the fact that certain components of a company’s marketing strategy or research are publicly available does not necessarily detract from an employer’s interest in maintaining the overall confidentiality of executive planning and decision making about that strategy. Breen argues EMC has not been sufficiently specific in identifying particular elements of EMC information which he is in a position to compromise at Oracle. I have carefully reviewed each side’s proffers in this regard, and I do not believe our law requires the type or degree of specification Breen demands.
Napolitano describes sales roadmaps or plans for EMC’s Unified Storage Division that ranged from 2012 to 2015. In addition to the tuning of product offerings, the roadmaps which were presented at executive meetings with Mr. Breen in attendance during 2012, allegedly included information about “competitive opportunities and competitive threats.” Napolitano Affidavit, at paras. 5-8. The Scannell Affidavit includes multiple examples of allegedly confidential business information in addition to those three-year roadmaps: “full sales strategy across all product lines,” “plays” which consisted of structured ways to win business for specific products; and other information about EMC’s basic methodology and sales trends which, it is alleged, have not changed. Scannell at paras. 16-19.
While Breen acknowledges he was exposed to certain of this information as part of his sales positions over 26 years for EMC, but most particularly in the final two years considered by the court, he and his supporters attempt to minimize the importance or legal impact of any recently acquired information in a number of ways. Two other former EMC employees (Messieurs Nagengast and Dennis), seek to corroborate Breen’s view, by opining that Breen received “vague” “executive summaries” only of product sales campaigns and projections, without detail. Nagengast Affidavit, at para. 10 (roadmaps were “notoriously lacking in details or substantive detail. . . considered as strategic placeholders”). They argue the information is not really confidential or protected by EMC, because certain “code” names for products, or for marketing appeals and advertising, appear on Internet blogs, or are identified at promotional trade meetings, and are thus publicly available. Nagengast, at para. 16 (“code names used as a marketing sales tool and did not focus on secrecy prevention”). Dennis Affidavit, at para. 19 (“EMC manages the life-cycles of its products ... most companies [do so]”); and at paras. 25-30 (regarding disclosure of code names on blogs and public presentations); Breen Affidavit, at paras. 82-104 (addressing certain aspects of impounded material, and where it is publicly disclosed). They aver the information is not truly unique or important to EMC, because there is no “magic” to EMC’s sales materials, and the material EMC seeks to protect amounts to nothing more than “common sales principles.” Supplemental Breen Affidavit, at paras. 8, 12.
By way of further argument, Breen and his witnesses opine that all of this marketing information identified by EMC is already stale, given the “quarter by quarter” nature of the business. They state “eight months [from June 2012 when Breen stopped working, to today] is an eternity in the technology sales business.” Opposition at 11; Miller Affidvit at para. 21. Nagengast, at paras 7-11 (roadmaps nine months into the future); and at paras. 12-15 (90-day time, quarter by quarter, “with regard to roadmaps a maximum of a 6-month window”); Dennis at paras. 15-20 (focus on period not greater than 9 months in the future; roadmaps “always changing”); paras. 22-23 (maximum of six-month window for roadmaps); Breen Affidavit at 66-69 (“I would really only focus roughly 6 months ahead”).
On balance, I am constrained to agree with EMC. Even from the outside, it is obvious that “how they do it,” ie., what components of market information EMC decides to weigh, and how it weighs them through particular sales force organization, formulae and graphic methodology, is unique to EMC and its sales culture. This “how” factor is embedded in all of the models and other materials presented at senior executive sales meetings, whatever those sales models may be called. I thus find the efforts by Breen to minimize the volume and quality of strategic information he was exposed to insufficiently persuasive at this stage of the *118 proceeding. EMC has met its preliminary burden to demonstrate that the application of this material, and other material like it with which Breen worked, is confidential to EMC, and could serve as a legitimate business interest to support an otherwise enforceable restriction on competition as a matter of law. Jet Spray Cooler, 361 Mass, at 839-42; Oxford GlobalResources, Inc. v. Consolo, 2003 Mass.Super. LEXIS 559 (Mass.Super. July 28, 2003) (Botsford, J.) [16 Mass. L. Rptr. 415]; EMC Corp. v. Allen, 1997 WL 1366836 (Sup.Ct. Dec. 15, 1997) (Kottmyer, J.) [8 Mass. L. Rptr. 21]; Lombard, 729 F.Sup.2d at 439 (argument that certain aspects of business information public does not detract from fact that certain information about strengths and weaknesses of product is confidential). Although Breen argues that broad-based cultural sales strategies are not protectable in Massachusetts, he offers no persuasive authority on analogous facts, and I am aware of none.
Enforceability of Covenants
The undisputed fact is that Breen has chosen to attempt to go to work for Oracle only four months after leaving his employment with EMC and collecting substantial compensation from it, in violation of the plain terms of the agreements he signed in July 2012 and September 2012, respectively—Le., Breen is admittedly about to compete.
Breen does not attempt to argue these provisions do not say what they say, or mean what they say, but rather urges that they should not be enforced as written. First, Breen argues that the work he will do for Oracle draws only on his lawfully transferrable skills, such as his organizational, management, and direct sales acumen, not the specific sales work he did for EMC (Mills Affidavit, at para. 11), Le. his “considerable experience in running a systems or hardware sales organization.” Opposition, at page 2. Second, Breen argues his own good faith and the policies Oracle has in place will prevent misappropriation of any legitimate EMC property, and that this should suffice to meet any obligation Breen owes EMC. I thus must consider whether, based on all of the preliminary facts presented, EMC demonstrates a reasonable likelihood of success in proving the provisions at issue enforceable as written under our reasonableness standard.
I presume for purposes of this analysis that Breen has physically “carried off’ nothing in the way of confidential information. I further presume that any pure memory recall Breen could hold of specific marketing details is limited, such that the longer-term risk of misappropriation of particular valuable information is de minimus. I also accept Breen’s proffer that the realistic shelf life of any such details is limited to somewhere in the range of six to nine months. Thus, sooner rather than later, Breen will be able to compete in reliance upon his own talents and expertise only, rather than on any information or methodology misappropriated from EMC, that is, he will be able to compete fairly. Jet Spray, 361 Mass, at 840; Alder Food Distrib., Inc. v. Keating, 2003 WL 33170823 (Mass.Super. June 6, 2000), at *7 (Doerfer, J.) [12 Mass. L. Rptr. 89] (pricing and sales information constantly changing and soon outdated); Office Max, Inc. v. County QuickPrint, Inc., 751 F.Sup.2d 221, 251-52 (D.Me. 2010) (temporal usefulness of pricing data extremely limited); Fox Sports Net North, LLC v. Minnesota Twins Partnership, 319 F.3d 329, 336 (8th Cir. 2003) (financial information regarding telecast rights for sporting events outdated).
All that said, EMC’s covenants recognize time and categorical limitations, and thus reflect an effort to tailor to the realities of the industry those constraints on an individual’s freedom to compete. The covenants proscribe competition only for one who on his last day of “active employment,” “is at the director level or above.” They apply only “[flor the twelve-month period following the effective date of your termination.” And the definition of confidential information for such purposes is limited to information obtained “during the two-year period prior to your last day of active employment.” All of these time period strike me as reasonable on the facts before me.
I have particularly considered the fair duration of the covenant in light of the facts presented. EMC does not dispute Breen stopped coming to work in June 2012. Breen accordingly argues that his last day of “active employment” as a matter of fact was June 2012, and pleads in the alternative that the applica-bilily of each of these covenants must be pegged to that date for all purposes in order to pass reasonableness muster. The difficulty with this argument, of course, is that Breen signed a second contract with EMC that must be read in conjunction with his non-compete. The Sept. 2012 Agreement incorporates the non-compete. In addition, however, it recites Breen’s last day of “active employment” to be August 31, 2012, and plainly sets his “termination date” to be the earliest of three alternative future events.[6] There is no ambiguity to these provisions, and Breen does not challenge the significant consideration he received for them. I thus can only find EMC has met its burden of demonstrating reasonable likelihood of success on the merits of the reasonableness of the covenants contained in both the KEA and the Sept. 2012 Agreement.
Balancing of Harms
This brings me to balancing the risk of harms to the respective parties.
EMC’s argument is straightforward: any interim employment by a competitor like Breen is a violation worthy of injunctive relief. This is because it is bound to harm EMC in immediate (if not immediately discernible) ways—Oracle will be able to benefit from all and whatever manner of expertise Breen has gathered about EMC’s market analysis acumen, regardless of whether that expertise is explicitly voiced, and not *119 withstanding Breen’s pledge to take care not to allow this to occur.
I note economic loss alone does not usually rise to the level of irreparable harm, unless it threatens the veiy existence of a business, Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Co., 399 Mass. 640, 643 (1987), and there can be no argument of that here. Moreover I accept Breen’s argument that the amount and nature of harm to EMC from any use of confidential information is blunted by its frequently changing nature.
Our courts have also acknowledged, however, that there can be a quality to the potential harm from unfair competition that is not adequately compensable by money damages. See, e.g. BNY Mellon, N.A. v. Cory Schauer, 2010 WL 3326965 at *10 (Mass. Superior) (Hinkle, J.) [27 Mass. L. Rptr. 329). Breen’s (and his new employer’s) apparent willingness to test the limits of the covenants does not inspire confidence that there will not be future efforts to do so. And, as noted by federal District Court Judge Casper, successful efforts to comply with safeguards merely reduce potential harm, they do not erase the fact of the breach. Aspect Software, 787 F.Sup.2d at 29. This concern is especially acute with confidential information. Lombard, 729 F.Sup. at 441-42.
What is also clear from the record is that Breen is an experienced professional in a highly competitive market, who chose to assume both the risks and the benefits of the 2012 covenants, and has now, a mere four months later, chosen to assume the risk of violating them. Breen does not argue any unusual or irreparable harm that would befall him outside the bargain predictable on the face of the covenant. I must agree with those courts that have found such a calculated risk as that taken here by Breen cannot be rewarded by allowing demonstrably unfair competition to continue unabated. Allen, 1997 WL 1366836, at *4; Cereva Networks, Inc. v. Lieto, 2001 WL 1228040 at *6 (Mass.Super. Oct. 12, 2001) (Brassard, J.) [13 Mass. L. Rptr. 694]. The balance of harms tips to enforcement of the covenants.
Because I find and rule that to allow Breen to ignore the bargains he made with EMC would fly in the face of Massachusetts public policy supporting enforcement of reasonable non-compete agreements, Breen must be enjoined from his violations. Marine Contractors, 365 Mass, at 289 (“The consequence of every covenant not to compete is that the covenator is deprived of a possible means of earning a living . . . [Defendant] has not established any extraordinary hardship”); BNY Mellon, 2010 WL 3326965, at *10; Allen at *5; Lombard, 729 F.Sup.2d at 442-43; Iron Mountain Info Mgmt., Inc. v. Viewpointe Archive Serv., LLC, 707 F.Sup.2d 92 (D.Mass. 2010); Shipley v. Kozlowski, 926 F.Sup. 28, 30 (D.Mass. 1996).
Conclusion
For all of these reasons, Plaintiffs Motion for Preliminary Injunction is ALLOWED as endorsed on Docket, at Paper 9.

Nhe Complaint for Injunctive Relief is pleaded in two counts: breach of contract; and disclosure of trade secrets/proprietaiy information.

N'here are multiple affidavits with exhibits on each side. I have attempted to review all of them with care, including the material subject to the impoundment order. On February 20, 2013, on the eve of issuance of this Order, the court received unsolicited, supplemental filings from Mr. Breen purporting to respond to material addressed at the hearing on February 13, 2013 (followed, predictably, by a response from EMC to that supplementation). In an abundance of caution and fairness to Mr. Breen, I have reviewed the multiple pages of supplemental material with an eye to any necessary reconsideration of the issues raised. However, I find the bulk of this new material to be simply redundant of Mr. Breen’s worldview which I have already carefully considered. The Supplemental Affidavit of Mr. Mills I find particularly non-probative, in its avowed goal to rebut aspects of colloquies which occurred at a hearing this non-party witness did not attend.

Nhis Memorandum highlights allegations and arguments the court views as material and/or dispositive at appropriate stages of the legal analysis.

Breen’s alternative argument, that onset should be June 2012, which he asserts was his last “active” day of EMC employment as a matter of fact, is addressed later in this Memorandum.

Millions of dollars in cash, vested restricted stock, and stock option consideration (for the KEA), and weekly separation payments and other benefits for the severance agreement.

(i) August 30, 2013; (ii) the date that you commence “New Employment” as defined below; (iii) the date you breach any obligation under this Agreement. Sept. 2012 Agreement, at para. l.(a).