McIntyre, Frances A., J.
This proceeding arises out of Life Image, Inc.’s action to enforce non-competition and non-solicitation clauses in an employment agreement with its former Vice President of Business Development, Michael S. Brown. Mr. Brown moved to Merge Healthcare on October 11, 2011. Both Life Image, Inc. and Merge Healthcare are involved in medical image interoperabilify.[1] Life Image, Inc. asserts counts of Breach of Contract, Misappropriation of Confidential Information, and Taking of Trade Secrets against Mr. Brown and counts of Obtaining Trade Secrets, Implied Covenants, and Tortious Interference against Merge. Plaintiff seeks a permanent injunction and a declaratory judgment.
An ex parte temporary restraining order entered on October 17, 2011. The subsequent hearing was set by agreement on November 17, and at the request of the parties, held until December 13, 2011 when a further hearing was conducted. After due consideration, the motion for a preliminary injunction is ALLOWED.
FACTUAL BACKGROUND
The facts are drawn from the parties’ affidavits. Life Image, Inc. is a start-up company located in Massachusetts; it was founded in 2008. Hamid Tabatabaie is the Chief Executive officer. He has many years of experience in radiology, image and information man *428 agement; Life Image, Inc. is his fourth start-up. The business purpose of Life Image is to address “the void in the market for a system to facilitate the easy and reliable exchange of medical imaging information across the boundaries of healthcare facilities, thereby avoiding duplicate exams, eliminating unnecessary patient exposure to excessive radiation, and ultimately reducing patient healthcare costs.”
Life Image occupies one niche; it has developed a cloud-based medical image-sharing system, chiefly for use in radiologic applications. With this product, radiological images can be stored on a server not owned by a hospital or chain of providers but owned by a third party. Metaphorically, the films are then in a “cloud." Thus, any medical provider properly licensed can access the cloud and the stored images for immediate diagnostic purposes. The products are named variously, but include LINCS, LISA and LILA. The innovation of Life Image is that a medical provider is not limited to viewing images available only at her own associated medical facilities, but can view images across a broad collection of hospitals and institutions who are also accessing the Life Image cloud. Further, the images can be made instantly available to expert radiologists for diagnostic consultation at a geographic remove.
On September 27, 2010, the Wail Street Journal recognized Life Image’s innovation in developing a cloud-based platform for sharing diagnostic images with its Technology Innovation Award. In November 2011, Life Image launched an internet physician referral directoiy at a conference of the Radiological Society of North America. I credit Mr. Tabatabaie’s affidavit and believe that Life Image’s products are, in fact, a dramatic innovation, cost-cutting, and experiencing a positive reaction from its market.
Michael Brown was hired in July 2009 into the position of Life Image’s Director of Business Development; he was one of the first fifteen employees hired by the fledgling firm. This predated the product sales which began in December 2009. The employment offer was contingent on his willingness to agree to confidentiality and non-competition provisions which are customary in his field. The firm’s primary goal for him was to establish early partnerships, international and national relationships, and major customers for Life Image. On February 1,2010, Mr. Brown was promoted to Vice President of Business Development; he always reported directly to the CEO, Mr. Tabatabaie. In the spring of 2011, Mr. Brown indicated to the CEO that he would be leaving Life Image at some future date. Those plans were accelerated in the summer because Mr. Brown’s personal situation changed and he decided to move to Chicago.
Paragraph 3(a) of the Confidentiality, Developments and Non-Competition Agreement (the “Agreement”) provided that, for a period of twelve months following his date of termination, Mr. Brown would not “engage directly or indirectly in any business presently engaged in by Life Image or in which Life Image engaged during the term of his employment.” Under 3(b), he agreed not to solicit or take away customers or potential customers, clients, etc. He agreed to maintain the confidentiality of all confidential information as defined in the Agreement and to hold it in trust for Life Image, per 1(b).
Mr. Brown signed this Agreement on July 31, 2009. Mr. Brown had been in the United States for five years at that point, and had been working at Siemens. He was a member of the Australian Army Reserve. Nothing suggests that his signature was procured under economic or any other form of duress. There is no dispute that the Agreement was made for consideration.
Merge Healthcare is larger and more established than Life Image; its range of products and services is broader. Historically, Merge has offered medical image storing and sharing on a traditional platform, called a vendor neutral archive. Not just radiology-focused, Merge offers solutions for cardiological, orthopedic, pediatric, or ophthalmological settings, but all the systems include medical imaging. It has one group in clinical trial and laboratoiy solutions not having to do with image-sharing.
In July 2011, Merge’s Senior Vice President of Solution Management-Product Strategy and Management Paul Merrild instructed another vice president to prepare a market analysis of Life Image, Inc.’s products and solutions. This resulted in a 58-page slide presentation dated July 27, 2011. A chart within compares Life Image, Inc.’s products with those of Merge. The study notes that “(t]he LINC (multi purpose sharing network) product seems to be the strategic long term direction to eliminate duplicate exams.” A graph within shows that Life Image, Inc. provides “manual cloud based results delivery,” “automatic cloud based results delivery,” “multi purpose sharing network” and “mobile viewing and sharing.” Merge had none of these capabilities to offer hospitals in July 2011.
A fair inference to draw from the presentation prepared by the vice president is that Merge was keenly aware of Life Image’s appeal to the market in an environment of rising health care costs. There are charts in the study that discuss Life Image’s customers, scale, prestige, and activity. The report establishes conclusively that there was knowledge and belief at the highest levels of Merge that Life Image was developing and marketing a powerful internet tool that was groundbreaking. It would reduce patient exposure to radiation, save 10-15 billion dollars in medical care costs, provide for quick consults by expert physicians outside the geographic area and the graph demonstrated that Merge had no equivalent product.
To its customers, Merge historically offered its iC-onnect product which provides radiological image *429 sharing that is VNA and not cloud-based. In recent months, Merge has been developing its own cloud-based medical image sharing device and calling it “Honeycomb.” In October 2011, Merge announced Honeycomb to the public, but as of this writing, it is not available to the market. Honeycomb has been developed by Merge in order to enter the cloud-based medical imaging marketplace.
On July 22, 2011, Merge’s chairman, Michael Ferro, instructed his Senior Sales Vice-President Stephen Martin to contact Mr. Brown in regard to possible employment, ostensibly because Mr. Brown was moving to Chicago. Mr. Martin immediately did so and on that veiy day, Mr. Brown lunched with Mr. Martin and described himself as intrigued by the possibility of joining Merge. The inference that Merge targeted Mr. Brown for recruitment because of his position with Life Image is inescapable.
Within days of this contact, Mr. Brown sent an email throughout Life Image that quoted Michael Ferro, the chairman of Merge, as saying that Merge had an application that was “the Life Image killer.” Mr. Brown wrote that “Merge is shaping up to be one of our biggest competitors.” (Emphasis in original.) He then advised CEO Mr. Tabatabaie that he would need to “step into the fray with Ferro.” Mr. Brown avers that he sent this out of loyalty to Life Image but I take it to show that he knew and understood that Merge’s business interests were directly competitive with those of his employer, Life Image.
Negotiations moved apace between Merge and Mr. Brown and there was a further meeting on August 22, 2011. Mr. Brown sent his Life Image Agreement to Merge, likely for a legal review. I conclude from this that Merge Healthcare was aware of Mr. Brown’s covenant with Life Image. On September 6, 2011, Mr. Brown gave his notice that he would leave Life Image without indicating his discussions with Merge.
On September 14, Mr. Brown met with Merge personnel. The meeting with Merge was in order to acquaint Mr. Brown with Honeycomb, the soon to be available product of Merge that was a direct head-to-head competitor with the Life Image product. Mr. Brown advised Merge that Honeycomb needed a method of importing patient’s (radiological) compact discs, which Honeycomb was not equipped to do. On that date, he was still in the employ of Life Image. This suggestion was not made in the best interests of Mr. Brown’s employer, Life Image.
Notwithstanding the denials of Merge staff, I find the circumstantial evidence compelling that Mr. Brown was recruited in order to sell a matching competitive application from Merge, and/or that Merge sought to learn information from Mr. Brown that would promote sales of iConnect or Honeycomb.[2]
On October 2, 2011, Mr. Brown notified Mr. Tabatabaie that he was moving to Merge as Vice-President of National Accounts. Mr. Brown began his employment with Merge on October 11, 2011.
As Vice President for Business Development and as an early and senior member of the business development team, Mr. Brown had on his company laptop the complete product for two of Life Image’s cloud-based applications, LILA and LISA for use at customer demonstrations. There is forensic evidence which I credit that on September 15, 2011, Mr. Brown copied the contents of his Life Image laptop computer onto a brand new MacBook and returned the Life Image computer on his final day of employment. Thus, he carried the complete Life Image product with him on his computer when he left Life Image and went to Merge. He also deleted emails to Merge from his “sent” folder, as though to cover those tracks.
A large volume of information was exported from Mr. Brown’s Life Image laptop onto a external hard drive between September 8 and September 14, after he had given notice. Those file names include Implementations, Customer Contracts, Promotional Materials and four others. There would be no need for Mr. Brown to collect this data on a hard drive as an employee of Life Image because it would be available (in its own cloud, apparently) at any time that he chose to access it, so long as he was in the employ of Life Image. This suggests that Mr. Brown sought to preserve this internal Life Image data in a fashion that would be available to him in his new job.
This case was filed in this court on October 17, 2011, and the temporary restraining order allowed in part. On October 18, 2011, Mr. Brown was served with the temporary restraining order, which required him to return all materials taken from Life Image. On receipt of the TRO of this court ordering him to preserve all data, Mr. Brown, apparently in a panic, deleted certain Life Image material from his laptop: this last is an apparent violation of this court’s order. All computer-stored materials taken from Life Image’s data are now secure in his lawyer’s office.
There is no direct evidence of Mr. Brown’s disclosure of confidential information to Merge but what is referenced above: however, there has been no discovery to date.
DISCUSSION
Injunctive relief “is an extraordinary remedy never awarded as a matter of right.” Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). The court must consider several factors to determine whether such relief is warranted: (1) the plaintiffs’ likelihood of success on the merits; (2) the irreparable harm to the plaintiffs in the absence of relief, and (3) the balance between the harm and the harm the relief would cause the defendants. Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001). The court also considers whether the relief sought will adversely affect the public. Id.
*430 A. Likelihood of Success
Chiefly, the plaintiffs claim is that Mr. Brown is in violation of the covenant not to compete. A non-compete agreement is only enforceable to the extent necessary to protect an employer’s legitimate business interests. Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 716 (1961). Legitimate business interests may include trade secrets, confidential information, or the good will the employer has developed over the course of its dealings with its customers. All Stainless, Inc. v. Colby, 364 Mass. 773, 778-80 (1974). Any non-compete covenant must be reasonably limited in time and geography and not be harmful to the public interest. Id. Protection from ordinary business competition is not a legitimate business interest. Richmond Bros., Inc. v. Westinghouse Broadcast Co., Inc., 357 Mass. 106, 111 (1970). A covenant not to compete which is designed solely to protect the employer from competition is not enforceable. Marine Contractors, 365 Mass. at 287-88. Thus, the primary issue is whether covenants in the Confidentiality, Developments and Non-Competition Agreement are enforceable against Mr. Brown.
i. Enforceability of the non-competition provision
Under the terms of the Agreement not to compete, Mr. Brown agreed not to “engage directly or indirectly in any business presently engaged in by Life Image or in which Life Image engaged during the term of his employment.” Under the terms of the contract, Merge is in the same business as Life Image.
Moreover, under the law, Merge and Life Image are direct competitors in the arena of medical imaging. LINCS and iConnect make radiological images available to a range of caregivers; they differ only in the mode of delivery and degree of coverage they provide. Merge does not need to manufacture identical products to be in direct competition with Life Image; the customer will purchase either product, but not both. Cereva Networks, Inc. v. Lieto, 2001 WL 1228040 (2001) [13 Mass. L. Rptr. 694]. These firms compete for the same customers. Merge’s offering of Honeycomb, a generically similar product to LINCS, reinforces that conclusion. The fact that Merge also offers other products to the public does not alter that result.
ii. Whether plaintiff has a legitimate business interest at stake in Mr. Brown’s employment with a competitor
Defendants dispute that the plaintiff has a legitimate business interest to protect. Due to the quick work of Life Image in bringing its complaint before the court, all the materials removed from Life Image by Mr. Brown on his laptop are now neutralized and unavailable to Mr. Brown and Merge. Deféndants argue that no usage of confidential information is proven thereby.[3]
It has not been shown by any direct evidence that Mr. Brown has compromised confidential information of Life Image to date, but then, discovery has not yet begun. Thus, this case hinges on whether plaintiffs have shown an inevitable misappropriation of confidential information.
The Agreement defines confidential information negatively. It is described as all information of the company, except for that which Mr. Brown can show is in the public domain, information he possessed before he worked for Life Image, and information disclosed to him by a third party. See the Agreement at 1(a).
It is argued, and I accept, that Life Image is operated with a high degree of transparency. Much information about the product and the medical facilities purchasing Life Image products are available online as part of its marketing. However, I believe that such material is encrypted to prevent further invasion beyond what Life Image chooses to show the world, and must be HIPAA compliant as well. I understand that contracts made by Life Image can be accessed via the FOIA, yielding pricing and other information. But based on the affidavits, I believe that information about Life Image is disseminated by the corporation with discretion and not indiscriminately, as the defendants suggest.
Mr. Brown and Merge take the position that Life Image has no confidential information and thus no legitimate business interest at stake; this is not a position squaring with common experience. Mr. Brown has not, and likely cannot, prove that information that exists in his memory and came to him aurally during conversations with other high level executives of this fledgling company during its incubation phase is in the public domain. Nor has he shown any organizational status and progress reports prepared for internal use that have escaped from Life Image, except via his laptop.
In the Life Image scenario, insider marketing information about a new venture would naturally come into the possession of a high-level employee, such as the Vice President of Business Development. A senior executive, like Mr. Brown, who was directly involved in the planning and marketing of a new product would know all about the roll-out of that product, information about the product’s benefits and weaknesses, adequacy of servicing and maintenance of the product once in place, ancillary product development in the future, corporate sales strategies both present and future, internal organizational information such as the strengths and weaknesses of sales staff, and customers’ idiosyncratic wants, needs, and complaints. Mr. Brown would necessarily hold in his head or in his computer insider marketing information, i.e., marketing strategy, management, and concepts specific to the cloud-based product. He would have gained this at Life Image. None of that inside marketing information has been shown to fit under any exception *431 to the definition of confidential information in the Agreement.
Here, the plaintiff has established by forensic examination that Mr. Brown downloaded to his laptop an “implementations file” which is a file of customer software implementations, showing how the customers are actually using the systems. He also transferred to his own computer a file of customer contracts and a file called “corporate overview,” which is about Life Image’s corporate strategy. He also took a computer file of “contact lists” of customer names and contact information and a “SalesMasterD-eck.ppt.” The latter is a master deck of slides with notes for sales personnel on how to position current and future products. He also took a “return on investment” calculator for Life Image customers, and a document of future products based on emerging data exchange standards.[4] The nature of the material Mr. Brown had on his computer proves the penetration into Life Image’s corporate mind that Mr. Brown achieved. He was privy to the most sensitive Life Image discussions and debates regarding Life Image’s strategic strengths and weaknesses and future planning. “He was a confidante and sounding board for all major decisions,” avers Mr. Tabatabaie.
iii. Inevitability of misappropriation of such confidential information
Mr. Brown’s new role at Merge is as Vice President-National Accounts. Ostensibly, he was hired by Merge to introduce Merge’s sales force to his medical industry contacts and educate his own contacts on Merge’s products and solutions, not to take advantage of his experience with cloud-based medical imaging. I do not accept this proposition.
I believe, based on what has been presented to me, that almost all of Merge’s business has to do with medical imaging, be it in the cardiological, orthopedic, pediatric, or ophthalmological environment. While it appears that clinical laboratory and clinical trials sections may well be set off from the imaging arena, the bulk of the business concerns medical imaging.
This judge is persuaded that cloud-based image-sharing is the direction of Merge for the future. In materials provided by plaintiff and not prepared for this litigation, Merge would appear to agree.[5] A press release dated November 28, 2011 promotes Merge iConnect.[6] Merge iConnect with Honeycomb is being positioned for the identical market as Life Image.
This judge cannot conceive of any way that Mr. Brown could educate his contacts about Merge’s emerging products without relying on internal marketing and product data about Life Image’s competing products. Customers will be deciding whether to buy Life Image or wait for the free Honeycomb bundled with iConnect. The analytical process a customer would undergo to make a purchasing decision would necessarily cause Mr. Brown to compare the more traditional Merge products with the Life Image innovation, insider knowledge of the deficiencies of which he had accumulated unfairly. Paragraphs 49 and 50 of Mr. Brown’s supplemental affidavit demonstrate the tightrope he is walking here. Moreover, insider knowledge of Life Image’s future marketing plans and any weaknesses in the present marketing would be incorporated in Mr. Brown’s national sales planning for Merge’s cloud-sharing future. For these reasons, I conclude that plaintiff has shown a likelihood that Mr. Brown will use insider information in his work for Merge. Therefore, Life Image maintains a legitimate business interest in protecting its confidential internal marketing information, which plaintiff has developed over the course of its dealings with its customers. All Stainless, Inc., at 778-80.
In summary, the plaintiff has proven that the covenant not to compete is likely to be enforceable in this court.
With regard to the tortious interference claim against Merge, the elements are restated. “To make out a claim of tortious interference with contractual relations, a plaintiff must demonstrate that (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions. Cavicchi v. Koski, 67 Mass.App.Ct. 654 (2006). Merge was aware of Mr. Brown’s agreement with Life Image. The circumstantial evidence conclusively demonstrates that Merge recognized Life Image’s innovations and likely saw in it a threat to its market dominance, and an advantage in hiring Mr. Brown. This court concludes that Life Image has established a likelihood that it will succeed on a tortious interference claim against Merge.
B. Irreparable Harm to Plaintiff
For the foregoing reasons, in this court’s view, Mr. Brown’s knowledge of the competing product will inevitably or inadvertently surface during Mr. Brown’s employment with Merge, because of his role and Merge’s new direction. He will inevitably or inadvertently make decisions for his new competing products based on information he holds about Life Image, and damage his former employer’s market in a fashion that cannot be monetized.
To allow Mr. Brown to bring Life Image’s insider marketing information to Merge to use in the sale of iConnect with or without Honeycomb is an unfair advantage. The timing is key. Life Image is “in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game.” PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1270 (1995) (italics supplied). Mr. Brown’s switch to Merge is not ordinary competition. It would be an exploitation of internal confidential information and an unfair advantage. Richmond Brothers, Inc. at 110.
*432 C. Prejudice to the Defendants
Mr. Brown is a man with an impressive resume and a successful salesman. But this judge is confident he can readily secure employment in the field with any firm not in the medical image interoperability business. He had another company interested in him before he decided on Merge.
I note that the Agreement sets no boundary for the non-compete clause, and the court will fix one. An internet company, which is without geographic boundaries, can only truly be protected by a global prohibition on work for a competitor, but that would be unreasonable, particularly for a non-citizen. Therefore, a restriction confined to the United States is reasonable in this circumstance.
Moreover, the time restriction in the covenant is reasonable. One year has frequently been adjudicated a reasonable amount of time. In this rapidly changing industry, it will insulate the plaintiff from Mr. Brown’s inside knowledge while it completes its rollout and Merge brings its product to market, without benching him unduly.
Sidelining Mr. Brown has greater than the usual consequences of loss of experience, time and money, because he is in this country on a work visa. Life Image secured that visa in June 2011.1 am told that allowance of this injunction may well result in the loss of his ability to legally remain in the U.S. It is most unfortunate that Mr. Brown put his visa status in jeopardy when he took the risk of moving to Merge, with apparent knowledge of possible outcomes. This judge has deliberated at length on this impact, finally determining that Mr. Brown ought not be held to a lesser standard because of his visa situation. A decision based on his visa would reduce his contractual obligations below that of a U.S. citizen in an identical situation. Therefore, it is not weighted heavily in the balance called for here. However, I will advance the matter for a speedy trial.
Defendants concede that the firms directly compete in the medical imaging market that is cloud-based, but claim that this is a only a narrow band of the market. By way of amelioration, Merge offers to remove Mr. Brown from any responsibility for products that are cloud-based and permit him to work on traditional image sharing products. Merge suggests that Mr. Brown could focus all of his efforts in areas that do not compete with Life Image so there would be no potential of disclosure of confidential information. Merge proposes a form of order that would allow Mr. Brown to market ¡Connect. This would carry with it the risk of inevitable misappropriation that I have found above.
This court is not inclined to permit Mr. Brown to work for Merge in that fashion under a court order not to disclose. His lack of judgment in deleting files upon receipt of the preservation order in the TRO and his solicited advice to Merge about the patient CDs while he was still in the employ of Life Image causes this court to doubt that he is possessed of the ability to wall off in his mind secret strategic marketing information about Life Image while he sells for Merge. Under these circumstances, a court order not to disclose fails to protect Life Image’s legitimate business interest. Moreover, I do not conclude that Merge ought have the benefit of Mr. Brown’s employment in contravention of his Agreement while the case pends for trial.
D. Public Interest
The public interest will not be deleteriously affected by restricting Mr. Brown’s employment before trial of the case. The public’s interest is served by having two fairly competing companies in the medical image interoperability market.
CONCLUSION AND ORDER
For the foregoing reasons, the Motion for a Preliminary Injunction in the form proposed by plaintiff is ALLOWED, but the.geographic scope is restricted to the United States. The case is set for a scheduling conference on January 13, 2012 at 2:00 PM to establish a discovery schedule and trial date.

Medical image interoperability is the ability of multiple users to view the same image.

At the hearings in this matter it was stated that Honeycomb would be a no-cost add-on to other Merge products: this marketing strategy would directly impact Life Image’s market.

However, questions with regard to breach of contract are answered with reference to the point in time when the alleged breach occurred. Aspect Software, Inc. v. Barnett, 787 F.Sup.2d 118, 129 (D.Mass. 2011). On October 11, 2011, when the defendant went to his first day of work at Merge, plaintiffs have shown that Mr. Brown then possessed information which was the exclusive property of Life Image. He undertook to delete some Life Image material, showing his awareness of liability for its possession. This evidence tends to favor the counts of breach of contract and misappropriation of trade secrets. But the potential harm to Mr. Brown here calls for a greater showing than that.

In response, Mr. Brown claims that these are all materials he downloaded in the usual course of his business, particularly performing automatic backup of his computer. I don’t accept that benign explanation at this point. He claims that he mtended to delete the Life Image material; I don’t accept that self-serving explanation, either. Mr. Brown indicated to Life Image in a September 17 email that he had confidential material but made no actual effort to return anything until the suit was filed a month later.

See William Blair: Equity Research: MERGE HEALTHCARE INCORPORATED (“Positive Highlights from Analyst Breakfast; Cloud-Based Sharing is the Future”), November 28, 2011.

“Moving images to the cloud provides of a number of operational benefits, including increased storage capacity and availability,” said Jeff Surges, CEO of Merge Healthcare. “Plus, it reduces costs and IT complexities as images are shared safely and securely over the Internet.” Merge Healthcare News Release. Media Contact: Brenda Stewart. Chicago; November 28, 2011.